**CHEYENNE AIRPORT BOARD and City of Cheyenne, Appellants (Defendants),**

v.

**Terry ROGERS and Brenda Rogers, Appellees (Plaintiffs).**

No. 84–301.

Supreme Court of Wyoming.

Oct. 8, 1985.

Rehearing Denied Nov. 1, 1985.

　　
　　

John C. Patton and Royann Fransen of Carmichael, McNiff & Patton, Cheyenne, and R. Walter Connell, Asst. City Atty., Cheyenne, for appellants, oral argument by Patton.

Bernard Q. Phelan, Cheyenne, for appellees.

Before THOMAS, C.J., and ROSE, ROONEY, BROWN and CARDINE, JJ.

CARDINE, Justice.

The question here presented for our determination is whether the City of Cheyenne zoning ordinance providing a height limitation in a noninstrument approach zone to the Cheyenne municipal airport is unconstitutional. The appellees, Terry and Brenda Rogers, own residential property in the noninstrument approach zone. The Rogerses purchased this residential property in 1976, which was two years after passage of the ordinance. The particular height limit on their property, about 26 feet, has not affected the residential usage of the property. It does affect, however, a large cottonwood tree which apparently exceeded the height limit by a few feet on the date the ordinance was passed. By the time of trial the tree had grown to a height of 48 feet and was, therefore, 22 feet above the height limitation.

For reasons that follow, we conclude that the ordinance is constitutional and valid as an exercise of the police power, both in general and as applicable to this case; that no compensable easement was taken; and, hence, that the judgment of the district court should be reversed.

On October 15, 1974, the City of Cheyenne adopted Ordinance No. 1969, §§ 1–15, Code Appendix B, which is entitled The Cheyenne Municipal Airport Zoning Ordinance. The general purpose of the ordinance is to keep the approach zones to the Cheyenne airport runways free from such obstructions as would interfere with the landing and taking off of airplanes.

Of particular importance to this case are the provisions for a noninstrument approach zone in § 3(2) and a height limitation on such zone in § 4(2) of the ordinance. Section 3(2) states:

"A noninstrument approach zone is established at each end of all noninstrument runways on the Cheyenne Municipal Airport for noninstrument landings and takeoffs. The noninstrument approach zone shall have a width of five hundred (500) feet at a distance of two hundred (200) feet beyond each end of the runway, widening thereafter uniformly to a width of two thousand five hundred (2,500) feet at a distance of ten thousand two hundred (10,200) feet beyond each end of the runway, its centerline being the continuation of the centerline of the runway."

Section 4 states:

"Except as otherwise provided in this ordinance, no structure or tree shall be erected, altered, allowed to grow, or maintained in any zone created by this

ordinance to a height in excess of the height limit herein established for such zone. Such height limitations are hereby established for each of the zones in question as follows:

\* \* \* \* \* \*

"(2) *Noninstrument approach zones:* One foot in height for each forty (40) feet in horizontal distance beginning at a point two hundred (200) feet from and at the elevation of the end of the noninstrument runway and extending to a point ten thousand two hundred (10,200) feet from the end of the runway."

The Cheyenne airport zoning ordinance, in contrast to many exercises of municipal zoning which are concerned with purely local matters, was passed under the authority and direction of both state and federal legislative bodies and was designed to protect both state and federal interests. To appreciate this blending of powers and authority, we must briefly examine the legal beginnings of the air age.

The federal government initiated the era of commercial air travel in 1926 with the enactment of the Air Commerce Act of 1926, 49 U.S.C. § 171, which in part declared a "public right of freedom of interstate and foreign air navigation" in the navigable airspace of the United States. Subsequent amendments preserved this declaration. 49 U.S.C. § 403 (1938); 49 U.S.C. § 1304 (1958); 49 U.S.C. § 1304 (Supp.1984).

The State of Wyoming made, in 1931, a similar declaration of right of public passage through the navigable airspace. Section 10-4-302, W.S.1977, asserts:

"The ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath subject to the right of flight described in W.S. 10-4-303 \* \* \*."

Section 10-4-303, W.S.1977, provides:

"(a) Flight in aircraft over the lands and waters of this state is lawful unless it is:

"(i) At such a low altitude as to interfere with the existing use to which the land or water, or the space over the land or water, is put by the owners;

"(ii) Conducted as to be imminently dangerous to persons or property lawfully on the land or water; or

"(iii) In violation of the air commerce regulations promulgated by the department of transportation of the United States."

Wyoming intended that its declaration and limitations be compatible with those of the federal government. Section 10-4-304, W.S.1977, states:

"W.S. 10-4-101 through 10-4-304 shall be construed as to effectuate its general purpose to make uniform the law of those states which enact it and to harmonize, as far as possible, with federal laws and regulations on the subject of aeronautics."

The air commerce regulations alluded to in §§ 10-4-303(a)(iii) and 10-4-304 have, according to John Wood, manager of the Cheyenne airport, specified that approach zones to airport runways be free from obstacles, but they have not specified the method by which this is to be accomplished by state and local governments. Presumably, exercises of eminent domain, police power and negotiated purchase would be equally satisfactory.

The State of Wyoming, in response to these regulations, has specifically authorized its municipalities to zone the approaches to airport runways. Section 10-5-301, W.S.1977, states:

"(a) The governing body of each incorporated Wyoming municipality and county may regulate and restrict by ordinance the number of stories and size of buildings and the height of other structures constructed upon land within one-half (½) mile of the boundaries of airports owned or controlled by the town, city or county. They may provide zoning for airspace beyond one-half (½) mile of the boundaries and within the county, to assure aircraft reasonable safety for visual and instrument approach and departure. The right to zone shall be confined to the geographical limits of the current appli-

cable approach zone established by the federal aviation administration for the particular airport and in no case shall the right to zone extend beyond six (6) nautical miles along the approach path from the end of the instrument runway."

This provision, permissive and not mandatory in nature, was the basis for the municipal exercise of zoning powers by the City of Cheyenne in adopting §§ 3 and 4, supra, of the Cheyenne Municipal Zoning Ordinance in 1974.

The ordinance was initially designed to operate prospectively and it, therefore, preserved rights in nonconforming uses which had vested on the effective date of the ordinance, § 6 providing that

"[t]he regulations prescribed by this ordinance shall not be construed to require the removal, lowering, or other changes or alteration of any structure or tree not conforming to the regulations as of the effective date of this ordinance."

However, such vested rights do not include the right of expansion. The ordinance specifically states that new growth or new additions on vested nonconforming uses are prohibited. Section 7(b) of the ordinance provides, in part, that:

"No permit shall be granted that would allow the establishment of or creation of an airport hazard or permit a nonconforming use, structure, or tree to be made or become higher, or become a greater hazard to air navigation, than it was on the effective date of this ordinance * * *."

This section codifies the general rule that expansion of a legally protected nonconforming use is not allowed. See *Wasinger v. Miller*, 154 Colo. 61, 388 P.2d 250 (1964).

The impact of these sections is to impose an ongoing duty of trimming on the owners of legally protected nonconforming trees. In this case, however, appellees did not make periodic trimmings of their cottonwood and, as stated, it grew to 48 feet at the time of trial. At that point, the pruning necessary to bring the tree into compliance with the ordinance would, according to David Powell, an arborist, quite likely have killed the tree which in his opinion was worth $2,064.

Irrespective of the silvicultural difficulties of pruning such a mature cottonwood, airport officials notified the Rogerses in July of 1982 that the tree was in violation of its protected nonconforming use status, and that the Rogerses would either have to trim it or the airport board would trim it at the Rogerses' expense.

The Rogerses would not accede to this ultimatum. After an unsuccessful attempt to procure advance damages from the City, they posted their property against unauthorized entrance and maintained their refusal to cut the tree. During this time, the Rogerses made no attempt to use the variance procedure provided for in the ordinance. The City of Cheyenne, therefore, was not afforded an opportunity to consider granting a conditional variance or other relief if appropriate in accordance with § 7(d) of the zoning ordinance which provides, in pertinent part, as follows:

"Any person desiring to erect or increase the height of any structure, or permit the growth of any tree, or use his property, not in accordance with the regulations prescribed in this ordinance, may apply to the planning commission for a variance from such regulations. Such variances shall be allowed where it is duly found that a literal application or enforcement of the regulations would result in practical difficulty or unnecessary hardship and the relief granted would not be contrary to the public interest but will do substantial justice and be in accordance with the spirit of this ordinance."

On April 12, 1984, the Rogerses commenced this litigation seeking a declaration that the ordinance was unconstitutional, both on its face and as applied to their property, and an injunction against enforcement of the ordinance. With regard to their contention that the ordinance violated both the Wyoming and United States Constitutions, the Rogerses claimed that the ordinance represented an uncompensated taking of an easement in the airspace

above their property and, also, would effect an unconstitutional taking if applied to the cottonwood tree in question or future trees that might penetrate into the zoned airspace.

The Rogerses' case was tried to the district court on September 20, 1984, and on October 19, 1984, the trial judge issued an order declaring:

> "Section 4(2) of Appendix B of the City Code of the City of Cheyenne * * * to be unconstitutional as applied to the plaintiffs herein as being without just compensation or due process of law."

Furthermore, the trial court permanently enjoined the City of Cheyenne and the Cheyenne Airport Board from the enforcement of Section 4(2) against the Rogerses.

Though somewhat unclear as to scope, the trial judge's ruling may not only have found the ordinance to be unconstitutional as applied but unconstitutional on its face as well. Though the order of October 19 declares the unconstitutionality to be only in the application to the Rogerses, it also purports to incorporate by reference the court's comments which were made at the conclusion of the parties' evidence. The trial judge said at that time, with regard to the ordinance as a whole:

> "I think there is no question here that private property is sought for the public's good and safety and that compensation should be paid. I find that this is not strictly an exercise of police power. It is similar to the construction of a highway * * * the City should condemn and a jury should decide what the damages are to the property by the City's taking."

Thus, it appears that the trial court declared the ordinance to be unconstitutional both as applied to the Rogerses' tree and future surface uses *and* to the extent that it created an overflight easement without the payment of compensation. As so viewed, the following distinct issues are presented for review:

1. Was an actual flight easement taken in the appellees' airspace? If so, is compensation necessary to the validity of such an interest?

2. Is the municipal zoning ordinance, to the extent that it restricts surface uses, a valid exercise of the police power, both in general and as applied to the appellees?

■ In addressing the issue of whether a compensable easement has been taken in the appellees' airspace, we first note that both the federal government and the State of Wyoming have declared a general right of free public passage through the air. The federal provision, 49 U.S.C. § 1304 (1958) (as amended, Supp.1984), declares on behalf of all citizens, a public right of freedom of transit through the navigable airspace. Section 10–4–303, W.S.1977, declares that private ownership of the surface is vested subject to the lawful right of flight.

These statutes can be viewed as either the uncompensated appropriation of an easement of flight as an aspect of the public domain, or as a redefining of the recognized extent of legally protectable property. The courts, understanding the need for an accommodation between modern air travel and common law property concepts, and recognizing that rigid notions of compensation for all intrusions ad coelum would effectively preclude commercial air travel, have consistently held, in cases since the federal and state declarations, that surface owners have no cause of action in trespass nor constitutional claim for uncompensated taking unless the exercise of the flight easement by aircraft produces nuisance—such as impacts on the surface. Thus, in the pivotal case of *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), the Supreme Court of the United States held that compensation to surface owners would be necessary only when overflights were so low and so frequent as to substantially interfere with the use and enjoyment of the property.

The subsequent case of *Griggs v. County of Allegheny, Pennsylvania*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), dealt with overflights emanating from a county-owned airport and crossing property zoned

for residential use. The Court held that the overflights would constitute a taking with the necessity of just compensation if such operations made residential use "unbearable" and thus made the property unuseable for its authorized purposes. 369 U.S. at 87–88, 82 S.Ct. at 532–533.

Though some jurisdictions have not insisted on a direct invasion of the airspace for a taking claim (see e.g. *Aaron v. City of Los Angeles*, 40 Cal.App.3d 471, 115 Cal.Rptr. 162 (1974), cert. denied 419 U.S. 1122, 95 S.Ct. 806, 42 L.Ed.2d 822 (1975)), these jurisdictions uniformly require that for a cause of action to exist, a property owner must suffer a substantial interference with the use and enjoyment of the surface. See *Batten v. United States*, 306 F.2d 580 (10th Cir.1962), cert. denied 371 U.S. 955, 83 S.Ct. 506, 9 L.Ed.2d 502 (1963), and Annot., 22 A.L.R.4th 863 (1983). See also § 10–4–303(a), W.S.1977, which codifies this requirement providing that overflight is lawful unless it is:

"(i) At such a low altitude as to interfere with the existing use to which the land or water, or the space over the land or water, is put by the owner;

"(ii) Conducted as to be imminently dangerous to persons or property lawfully on the land or water; or

"(iii) In violation of the air commerce regulations promulgated by the department of transportation of the United States."

In the present case, the Rogerses have not contended, nor was evidence presented showing, that flights from the Cheyenne airport have caused substantial interference with the use and enjoyment of their residential property. All that was shown was that planes were flying in the airspace that the state and federal governments have reserved for lawful air travel. This court, under precedent and logic, must hold that such a showing does not establish a cause of action or constitutional claim.

■ We note also in passing that even if a proper claim based on overflight alone were presented, that such claim would arise either when the United States and

Wyoming declared a public right of free transit through the navigable airspace (see 29 U.S.C. § 1304 (1958) (as amended Supp. 1984) and § 10–4–302, W.S.1977), or no later than the date of the first airplane overflight. The Rogerses made no claim for the use of the easement in the airspace until April 12, 1984, and then the claim was directed only against the City of Cheyenne and the airport board. Section 1–3–103, W.S.1977, provides that an action for the recovery of title or possession of lands, tenements or hereditaments can only be brought within ten years after the cause of action accrues. Cases from other jurisdictions indicate that the running of such statutes of limitations bar subsequent claims of inverse condemnation. See Annot., 26 A.L.R.4th 68 (1983). Thus, § 1–3–103, supra, would seemingly preclude a claim (had such a claim even been made) that the federal or state government had taken a general flight easement by either their declarations of public right or by their use of the airspace.

■ The Cheyenne Municipal Airport Zoning Ordinance, No. 1969, §§ 1–15, Code Appendix B, was adopted on October 15, 1974. Appellees claim that the declaration of a flight easement in the ordinance was an unconstitutional taking and within the ten-year limitation provided for by § 1–3–103, W.S.1977. This court does not, however, view the ordinance itself as the actual creator or appropriator of the flight easement, as this was either accomplished by the state and federal statutory declarations or by the repeated physical acts of overflight. Instead, we view the Cheyenne ordinance as an exercise of delegated police powers which was intended to *protect* the easement from activities on the surface. The impact of the police power zoning regulation on the actual and potential surface activities raises certain other legal and constitutional issues, which we will discuss infra.

To conclude this first segment and to preface our discussion of the ordinance as an exercise of the police power, we reiterate our belief that the mere fact of over-

flight without evidence of impact on the surface, does not create a constitutional claim against either the City of Cheyenne or the airport board for the unconstitutional taking of a flight easement. In addition, the flight easement utilized by airplanes was not taken by the passage of the city zoning ordinance, but by federal and state declarations of public navigability and by repeated overflights which preceded this action by considerably more than the ten years allowed by the statute of limitations pertaining to real property actions. Finally, we hold that the city ordinance is properly viewed as an exercise of police power designed to protect this long-existent flight easement. As such it raises discrete issues of constitutional and legal validity, and we turn now to a discussion of these issues.

The police power can be generally described as a government's ability to regulate private activities and property usage without compensation as a means of promoting and protecting the public health, safety, morals and general welfare. See *Weber v. City of Cheyenne*, 55 Wyo. 202, 97 P.2d 667, 670 (1940). Zoning is a particular exercise of the police power. It involves the division of land into zones and within these zones the regulation of both the nature of land usage and the physical dimensions of these uses including height setbacks and minimum area. Airport zoning, as a more refined exercise, deals with the regulation of the type of land activities and their physical dimensions in the immediate vicinity of airports. The general purpose of such airport zoning is to prevent conflicts from emerging between adjacent landowners and their uses and airplane overflights.

There are several potential limitations on the local employment of airport zoning, some of which pose no real problems in this case. In one basic sense, local zoning must be authorized, as even after home rule amendments, municipalities remain largely the creatures of the sovereign state and in need of specific delegations of powers. This is especially so with regard to subjects like airports and their regula-

tion which clearly are matters of statewide significance. The Wyoming legislature, as a means of protecting the state-declared public flight easement passed an enabling act, § 10–5–301, W.S.1977, supra.

Even after enabling legislation is passed and local regulation is authorized, the local grants of power with regard to matters of statewide concern can be preempted by either subsequent state legislation or federal power exercises. With regard to the case at bar, it is clear that the state has not amended its specific delegation of power to the municipalities, and that the federal regulations continue to insist on obstruction-free approach zones.

Constitutional limits, however, stand apart from the authorization of either federal or state bodies and bind not only the recipients of delegated powers but also the delegators. The federal constitutional limits contained in the Bill of Rights apply directly to federal officials and to agencies, such as the Federal Aviation Agency, and indirectly to the states through the Fourteenth Amendment which, in part, imposes its own direct limits of due process and equal protection on state actions, and also imposes other limits from the federal Bill of Rights which are deemed incorporated into the concept of due process and thus made applicable to the states. State constitutions may add to these limitations and may be more protective of individual liberties. They may not, however, under the dictates of supremacy, be less protective. *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); see generally Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.Rev. 489 (1977).

Both the United States Constitution and the Wyoming Constitution impose due process limitations on exercises of the police powers. The Fifth and Fourteenth Amendments to the United States Constitution and Art. 1, § 6 of the Wyoming Constitution all assert that no person shall be deprived of life, liberty or property without

due process of law. In general, Wyoming has, in zoning cases, interpreted its due process provision in a manner parallel to the federal provisions. See e.g. *Board of County Commissioners of Teton County v. Teton County Youth Services, Inc.,* Wyo., 652 P.2d 400, 414 (1982).

■ The due process clause has both a procedural and a substantive aspect. *State v. Langley,* 53 Wyo. 332, 84 P.2d 767 (1938). In the case at bar the trial court declared that Cheyenne's airport zoning ordinance failed to meet constitutional standards of substantive due process. For the reasons that follow, we cannot agree with this conclusion.

■ The constitutional standard of substantive due process, under both United States and Wyoming interpretations, demands that a police power regulation must promote a legitimate public objective with reasonable means. The substantive due process standard of reasonableness is applicable during the initial legislative process and theoretically confines the legislators. The judiciary may, in the context of an actual case, be called on to measure the legislative performance against the constitutional standard. When the legislative enactment lies in the economic and social welfare area, and when there are no suspect criteria or fundamental interests involved, the court will, in testing the enactment, inquire only as to whether the regulation is of debatable reasonableness. In other words, if the court perceives that the legislature had some arguable basis for choosing the end and the means, it will sustain the regulation at least as to compliance with substantive due process. Only when a regulation amounts to an arbitrary deprivation of regulatees' property will it be deemed to violate the dictates of substantive due process. As we said in *Washakie County School District No. One v. Herschler,* Wyo., 606 P.2d 310, 333 (1980), cert. denied 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28:

"When an ordinary [nonfundamental constitutional] interest is involved, then a court merely examines to determine whether there is a rational relationship between a classification * * * and a legitimate state objective."

■ In the present case the appellees sought, and the trial court apparently granted, a declaration of the ordinance's general or facial invalidity under substantive due process. We conclude, for reasons that follow, that the ordinance does comply with the requirements of substantive due process and that the trial court's contrary conclusion is erroneous.

■ The legitimate objectives of the police power are loosely characterized as being public in nature and the potential range is very broad. See *Hawaii Housing Authority v. Midkiff,* —— U.S. ——, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984); *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). There is no real dispute in this case that the objectives of the Cheyenne airport zoning ordinance are both public and legitimate. The trial judge, in fact, stated:

"I think there is no question here that private property is sought for the public's good and safety * * *."

As to the means chosen by the Cheyenne council to achieve these objectives, we reiterate that, in the economic and social welfare area and when the ordinance is examined in a general, facial manner, the courts will usually go no further than to ascertain the debatable reasonableness of the legislative choices. See *Snake River Venture v. Board of County Commissioners, Teton County,* Wyo., 616 P.2d 744, 753 (1980). The United States Supreme Court, in dealing with general, facial challenges to local exercises of police power, has sustained the substantive due process reasonableness of a number of facets of local zoning. Thus, in *Village of Euclid, Ohio v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016 (1926), the Court determined that in a general sense, it is constitutionally reasonable and in accord with substantive due process for a local legislature to use comprehensive zoning and its uncompensated restrictions on use and bulk in

order to promote the health, safety, morals, and general welfare. In *Gorieb v. Fox*, 274 U.S. 603, 47 S.Ct. 675, 71 L.Ed. 1228, 53 A.L.R. 1210 (1927), the Court upheld the general reasonableness of zoning setbacks and their requirement that portions of plots be left unbuilt. In *Goldblatt v. Town of Hempstead, New York*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), the Court upheld the general reasonableness of local zoning restrictions on excavations below the depth of the water table. In *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Court sustained the general constitutionality of height limitations that New York City had imposed to protect historic and aesthetic landmarks. See also *Welch v. Swasey*, 214 U.S. 91, 29 S.Ct. 567, 53 L.Ed. 923 (1909).

■ These Supreme Court precedents do not address the specific issues of airport zoning and its general validity under the standards of substantive due process. We note, however, that they do deal with zoning provisions and restraints on the portions of property that can be physically used. Thus, the United States Supreme Court has sustained the general constitutional reasonableness of restrictions on the depth of activities in the subsoil (*Goldblatt v. Town of Hempstead, New York*, supra), the lateral extent of activities on the surface (*Gorieb v. Fox*, supra, and *Village of Euclid, Ohio v. Ambler Realty Co.*, supra), and the height of activities in the airspace (*Penn Central Transportation Co. v. City of New York*, supra). We hold, therefore, that to the extent that the lower court in the present case purported to enjoin airport zoning in general as contrary to the demands of substantive due process, it was in error.

Substantive due process, with its emphasis on legitimate objectives and rational means, can be explored and applied in a general sense when the reasonableness of the entire ordinance or statute is in question. See e.g. Village of Euclid, Ohio v. Ambler Realty Co., supra. It can also be examined in a specific sense, when the court evaluates the reasonableness of a law as applied to an individual. See *Nectow v. City of Cambridge*, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928). In a case with some similarities to the one at bar, the Supreme Court sustained the specific reasonableness of a regulation that resulted in the destruction of one party's ornamental cedar trees in order to save local apple crops from cedar rust.

"The Supreme Court held that the trees could be destroyed by the state without incurring any constitutional duty to compensate the injured landowner. The Court observed that apple production was an important agricultural activity in Virginia while the ornamental cedar trees had only minimal importance. The Supreme Court concluded that '[w]hen forced to such a choice, the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another, which, in the judgment of the legislature, is of greater value to the public.' Like the zoning-property use decisions, this case comports with modern substantive due process analysis by allowing the government to determine how to deal with societal problems without strict judicial review." (Footnote omitted.) J. Nowak, R. Rotunda, J. Young, Constitutional Law 490 (2d ed. 1983).

Though there are examples of cases that deal with substantive due process as applied in particular cases, see e.g. *Penn Central Transportation Co. v. City of New York*, 42 N.Y.2d 324, 397 N.Y.S.2d 914, 366 N.E.2d 1271 (1977), most cases that deal with the particular impact of a land use regulation do so under the provisions of the taking clause. The appellees in the present case made several arguments based upon the taking clause, and the trial court accepted them. We next consider the limitations posed by the taking clause provisions.

■ The Fifth Amendment to the United States Constitution states in part: "nor shall private property be taken for public use, without just compensation." The

Fourteenth Amendment which directly binds the states does not have a taking provision but it was early held that the Fourteenth Amendment due process clause incorporates the concepts and limitations of the taking clause. *Chicago Burlington and Quincy Railroad Co. v. City of Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). The Wyoming Constitution, Art. 1, § 33, states that "[p]rivate property shall not be taken or damaged * * * without just compensation."

The taking clauses have three possible areas of application. They serve to confine formal exercises of the sovereign power of eminent domain. They apply to cases where governmental action effectively takes or destroys a private interest in property. These situations are described as inverse condemnation. Finally, the clause can cover those situations where the impact of a regulation is deemed to be too severe to be borne without payment of just compensation. We will look with more particularity at the latter two situations as they are alleged to exist in this case.

Inverse condemnation which is generally a physical taking in fact, as opposed to a taking by formal procedure, can involve situations where the government or those acting under government auspicies physically occupy all or part of a private estate in land. If such occupation exists, then just compensation is owed for the interest in exclusive possession that has been appropriated. See *Sheridan Drive-In Theatre, Inc. v. State,* Wyo., 384 P.2d 597 (1963). It is significant to note that when government actively takes an interest in property through physical occupation, it is usually obligated to pay the fair market value of the interest acquired—without regard to the value of the property remaining in private hands. See *Loretto v. Teleprompter Manhattan CATV, Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), where the Supreme Court found that an ordinance, that authorized cable television companies to install receivers on private buildings, amounted to the taking of a compensable easement—without regard to the remaining value of the building to the private owner.

Perhaps the clearest example of an inverse condemnation occurs when the government floods private property without the prior payment of compensation. See *Pumpelly v. Green Bay & Mississippi Canal Co.,* 80 U.S. 166, 13 Wall. 166, 20 L.Ed. 557 (1871). Less clear but still covered situations would include intrusions on private property by members of the public pursuant to governmental authorization. Thus, in *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the Supreme Court held that the federal government could not require the owners of a private marina to allow the public free access without the payment of just compensation.

Airplane overflights can constitute inverse condemnation but as noted earlier, the courts have generally not found a taking from mere passage through the airspace. Rather, as held in *United States v. Causby,* supra, 328 U.S. 256, 66 S.Ct. 1062, flights over private land are not deemed a taking unless so low and so frequent as to be a direct and substantial interference with the use and enjoyment of land. See Annot., 57 L.Ed.2d 1254, 1260–1261 (1978). As noted, the appellees in this case have not demonstrated any evidence of substantial interference with the use and enjoyment of the surface. There is, therefore, no basis for an allegation of inverse condemnation due to overflight.

We turn now to a discussion of the zoning ordinance and whether its regulatory impact on appellees' land amounts to a taking. We have previously discussed our conclusion that the municipal ordinance does not itself amount to the compensable taking of an affirmative easement in the airspace. Rather, the flight easement was initially taken by federal and state declaration and by actual uses, and the ordinance serves merely to protect this affirmative easement. The appellees, however, have also argued that the protective effect of the zoning ordinance is to create a *negative*

easement without compensation. A negative easement theoretically involves only a servient tenement and not a dominant one. The owners of such servient tenements would, by virtue of the negative easement, be precluded from the full spatial usage of their property. The holder of a negative easement has, by virtue of such an interest, no right to active use; rather the holder can merely insist that the burdened party refrain from certain uses or uses in certain areas.

In the present case, the appellees insist that their property is burdened by a negative easement because they are precluded from building or allowing their trees to extend above the ordinance's height limit. The appellees assert that such negative easements represent property interests taken by the government even though the government is not an active user and that such takings require compensation without regard to the remaining value of the regulated plot.

■ The Supreme Court of the United States chooses not to view zoning setbacks and height limits as the creation of compensable negative easements. This argument was raised in *Penn Central Transportation Co. v. City of New York,* supra, and the majority replied that extensive precedent precluded this argument.

"These cases [*Welch v. Swasey, Goldblatt v. Hempstead, Gorieb v. Fox,* supra] dispose of any contention that might be based on *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), that full use of air rights is so bound up with the investment-backed expectations of appellants that governmental deprivation of these rights invariably—i.e., irrespective of the impact of the restriction on the value of the parcel as a whole—constitutes a 'taking.' Similarly, *Welch, Goldblatt,* and *Gorieb* illustrate the fallacy of appellants' related contention that a 'taking' must be found to have occurred whenever the land-use restriction may be characterized as imposing a 'servitude' on the

claimant's parcel." 438 U.S. at 131 n. 27, 98 S.Ct. at 2662 n. 27.

Rather, the Supreme Court views the situation where a landowner is restrained in his use of one spatial area of his property—his airspace, side yards or subsoil—as merely one species of use regulation. The Court thus presumes that no actual property in these cases had been appropriated by the government and an unconstitutional taking will be found only if the regulation fails the balancing test first articulated in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322, 28 A.L.R. 1321 (1922).

Under Justice Holmes' reasoning in *Pennsylvania Coal Co. v. Mahon,* the taking clause application was expanded beyond the formal eminent domain and inverse condemnation of physical interests in property. Under Pennsylvania Coal Company's balancing test, a regulation can also be deemed invalid as an uncompensated taking if it goes too far in its restrictions on the *use* of property. This situation can be clearly differentiated from cases where the government appropriates actual easements as there are no necessary physical or spatial aspects. Instead, the regulation's impact on *usage* is the key.

■ The taking through excessive use regulation is also differentiated from cases of formal or inverse condemnation of actual property interests in that, when the government takes an actual easement, it must pay the fair market value of the interest taken, regardless of the value of the remaining plot. See *Loretto v. Teleprompter Manhattan CATV, Corp.,* supra, 455 U.S. 419, 102 S.Ct. 3164. In the excessive regulation cases, the remedy, where the regulatory impact has gone too far, has generally been limited to a declaration of unconstitutionality and an injunction. See *Penn Central Transportation Co. v. City of New York,* supra, 42 N.Y.2d 324, 397 N.Y.S.2d 914, 366 N.E.2d 1271.

■ The application of the balancing test involves a comparison of the substantiality of the public interest with the impact

upon the individual. Though such a comparison can conceivably be made when the general constitutionality of a regulation is questioned, see *Pennsylvania Coal Co. v. Mahon,* supra, the vast bulk of regulatory taking cases have involved instances of specific application. To the extent that the appellees in the present case have alleged an unconstitutional regulatory taking, it is clear that their focus is on the specific application of the regulation to their plot and not on all the impacts that might stem from the entire ordinance.

The balancing test and the components of comparison are not rigidly fixed. However, certain relevant factors can be identified and certain principles as to how these factors should be treated have been established in the Supreme Court opinions.

 In assessing the substantiality of the government interest, the courts may be concerned with whether the regulation can be characterized as designed to prevent a harm (the theoretical province of the police power) or intended to secure a benefit (the theoretical province of eminent domain). If the regulation is deemed to be directed at a potential harm, the courts are then concerned with the harm's imminence, its severity, and how likely the law is to be successful in preventing the harm. See J. Nowak, R. Rotunda, J. Young, Constitutional Law 492; see also *United States v. Caltex,* 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952); and *United States v. Central Eureka Mining Company,* 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958), where the regulations were reasonably designed to prevent imminent, severe wartime harms. The substantial governmental interest in the regulations thus permitted a high degree of impact on private property without exceeding the taking clause limits.

 The Supreme Court has clearly stated that the impact to be considered and balanced is the impact of the regulation on the plot as a whole. The impact of the regulation on discrete segments is not rele-

vant. In *Penn Central Transportation Co. v. City of New York,* supra, the Court said:

" 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole— here, the city tax block designated as the 'landmark site.' " 438 U.S. at 130–131, 98 S.Ct. at 2662–63.

 In assessing the impact of the regulation on the plot as a whole, the more relevant of the elements a restrained landowner can show are: the near-complete frustration of investment-backed expectations; the diminution of the property's market value as a result of regulation; and, perhaps most significantly, the absence of a reasonable remaining economic use. See *Penn Central Transportation Co. v. City of New York,* supra, 438 U.S. at 127–137, 98 S.Ct. at 2660–2666. The plaintiff has the burden of establishing these claims. If he fails to do it, the court will not presume the impact. In describing the result in *Goldblatt v. Hempstead,* supra, the Court in *Penn Central Transportation Co. v. City of New York,* supra, said:

"*Goldblatt v. Hempstead,* supra, is a recent example. There, a 1958 city safety ordinance banned any excavations below the water table and effectively prohibited the claimant from continuing a sand and gravel mining business that had been operated on the particular parcel since 1927. The Court upheld the ordinance against a 'taking' challenge, although the ordinance prohibited the present and presumably most beneficial use of the property and had, like the regulations in Miller and Hadacheck, severely affected a particular owner. The Court assumed that the ordinance did not

prevent the owner's reasonable use of the property since the owner made no showing of an adverse effect on the value of the land. Because the restriction served a substantial public purpose, the Court thus held no taking had occurred." 438 U.S. at 126–127, 98 S.Ct. at 2660–61.

■ In addition, if the plaintiff fails to utilize available administrative procedures such as those allowing variances, the courts may also find that impact has not been clearly shown. *Penn Central Transportation Co. v. City of New York*, supra, 438 U.S. at 137, 98 S.Ct. at 2665–66.

■ In the case at bar, the appellees have alleged a taking pursuant to the airport zoning ordinance's height limit as to both the cottonwood tree presently exceeding the height limit, and the future trees or possible residential additions which may be affected. As previously noted, the uniform treatment of this claim precludes the characterization of such restricted plot usage as the compensable appropriation of a property interest in the airspace. Therefore, this facet of appellees' claim depends on application of the balancing test and a comparison of the substantiality of the government interest and the impact on the plot as a whole.

In assessing the impact on the plot as a whole, it is noteworthy that the Rogerses made no attempt to use the variance procedure contained in § 7(d) of the zoning ordinance. The municipality might, if appellees had made the necessary showings, have granted a variance for the tree and for possible future uses. In such an event, the regulatory impact of the ordinance would have been alleviated. Appellees' failure to use the variance provision denies the municipality an administrative means of protecting its ordinance from constitutional challenges and of fashioning individual relief in accord with both justice and the spirit of the ordinance. See *Baggett v. City of Montgomery*, 276 Ala. 166, 160 So.2d 6 (1964).

It is also noteworthy that appellees purchased the zoned property after the ordinance had been in effect for almost two years, a fact that indicates it unlikely that appellees have suffered loss of "distinct, investment-backed expectations." *Penn Central Transportation Co. v. City of New York*, supra, 438 U.S. at 127, 98 S.Ct. at 2660–2661. Finally, the required existence of impact does not appear, for appellees' residential usage of the plot was not noticeably affected until 1982 when the height of a single tree became legally problematic.

With regard to this particular cottonwood, appellees claim that the ordinance as applied will result in a loss of $2,064. It seems likely that the loss would have been substantially less if appellees had complied with the ordinance in 1976 and periodically trimmed the tree and not allowed it to substantially exceed the allowed height. It also is apparent that this figure is far less than the value of the plot for residential purposes.

In summation, the cases involving taking, including those cited by the appellees for the proposition that the particular application of airport zoning effects a taking, have almost always involved situations of substantial or nearly total restriction of plot usage or value. The appellees have failed to demonstrate such a significant impact as to counterbalance the significant public interest in protecting the airport flight path.

For the reasons enunciated, the judgment of the trial court is reversed.