# IN THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 75

**APRIL TERM, A.D. 2025**

**July 11, 2025**

THOMAS HAMANN,

Appellant
(Plaintiff),

v.

HEART MOUNTAIN IRRIGATION
DISTRICT, a Wyoming Public Irrigation
District,

Appellee
(Defendant).

S-24-0234

*Appeal from the District Court of Park County*
*The Honorable Bill Simpson, Judge*

*Representing Appellant:*
　　Austin Waisanen, Jeffrey W. McCoy; Pacific Legal Foundation, Sacramento, California.

*Representing Appellee:*
　　Thomas A. Thompson, Wyoming Local Government Liability Pool, Cheyenne, Wyoming.

*Before BOOMGAARDEN, C.J., and FOX\*, GRAY, FENN, and JAROSH, JJ.*

\* Justice Fox retired from judicial office effective May 27, 2025, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (2023), she was reassigned to act on this matter on May 28, 2025.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Chief Justice.**

[¶1]     Thomas Hamann brought this action alleging Heart Mountain Irrigation District (HMID), through the conduct of its manager, Randy Watts, damaged his property and caused him bodily injury. Mr. Hamann sought damages from HMID and Mr. Watts based on claims of inverse condemnation and violation of his constitutional rights under 42 U.S.C. § 1983. The district court granted summary judgment to HMID and Mr. Watts and dismissed Mr. Hamann's lawsuit in its entirety. Mr. Hamann appeals only the district court's dismissal of his inverse condemnation claim against HMID. We reverse and remand.

## ISSUE

[¶2]     The single issue on appeal is whether the district court erred in dismissing Mr. Hamann's inverse condemnation claim in its order granting summary judgment.

## FACTS

[¶3]     HMID is an irrigation district organized pursuant to state law. As such, it has the powers provided in Wyo. Stat. Ann. § 41-7-210(a)(iv) (2023), including the authority "[t]o exercise the power of eminent domain" pursuant to Wyoming law. *Id.* § 41-7-210(a)(iv)(E). According to its bylaws, "[t]he District shall be managed and controlled by the board of five Commissioners elected by the unit holders at the annual election, which board shall constitute the corporate authority of said District and shall exercise the functions conferred upon it by law." The board is tasked with the duty to "[m]anage and conduct the affairs and business of the District." In doing so, it has the power to "[e]mploy such agents, attorneys, officers and employees as may be required, and prescribe their duties." Its bylaws further provide it will hire a manager, who "shall have general charge of the district and the employment of personnel thereon."

[¶4]     Mr. Hamann owns and operates an approximately 100-acre ranch in Park County, Wyoming. Approximately 75 acres of his ranch are irrigated with water provided by HMID, and the entire ranch is within HMID's boundaries. A county road runs along the northern boundary of Mr. Hamann's property. Immediately south of the road is a canal operated by HMID, referred to by HMID as "Lateral 79." As early as 2016, a dispute arose between Mr. Hamann and HMID over whether HMID had an easement to construct a road along the south side of Lateral 79 to be used by HMID for maintenance work on the canal. Randy Watts, HMID's manager, insisted a maintenance road was necessary, and HMID believed some of Mr. Hamann's fencing was obstructing its asserted easement. The parties had not yet reached an agreement about the maintenance road when the events giving rise to this action occurred.

1

[¶5]    In early 2018, Mr. Hamann and his neighbors to the east, the Riolos, wanted to move a concrete bowl (the Riolo bowl)[1] from the eastern edge of Mr. Hamann's property to the Riolos' property. Because the bowl facilitated irrigation on the Riolos' property, Mr. Hamann wanted the bowl moved to their property; the Riolos also wanted the bowl moved, as they were experiencing difficulties getting enough water. According to Mr. Hamann, HMID did not care whether the bowl was moved, so long as both parties consented. To facilitate the move, Mr. Hamann granted HMID access to his property "in limited fashion and scope to go only onto the corner of his property south of Lateral 79 in order to remove [the Riolo bowl]." Mr. Hamann removed a fence panel on the east side of his property to allow HMID access to the bowl.

[¶6]    On June 28, 2018, Mr. Watts arrived at the Hamann property and met with Mr. Hamann and his wife at the location of the removed fence panel. Mr. Hamann and Mr. Watts immediately disagreed about the scope of the work to be performed that day. Mr. Hamann believed HMID was only there to move the Riolo bowl, while Mr. Watts believed "that Mr. Hamann was going to allow us entire access to [the south] side of the lateral." Mr. Hamann returned to his home, where he saw Mr. Watts and Kenny Unruh, another HMID employee, proceeding toward his driveway in an excavator. Seeing that Mr. Watts and Mr. Unruh had gone past the corner of his property where the Riolo bowl was located, Mr. Hamann called the sheriff before going to the driveway to confront them. Mr. Unruh began removing portions of an archway at the front of Mr. Hamann's driveway with the excavator while Mr. Watts argued with Mr. Hamann. Eventually, Mr. Watts replaced Mr. Unruh in the excavator and drove away from the archway while Mr. Hamann followed on foot. Mr. Watts eventually crossed onto the property west of the Hamanns' before proceeding back toward the Hamanns' property. Mr. Watts then began to remove several pieces of Mr. Hamann's fence. Mr. Hamann stood in the way and tried to stop Mr. Watts and get him to wait until the sheriffs arrived, but he was unsuccessful in preventing damage to the fence. According to Mr. Hamann, at one point Mr. Watts struck Mr. Hamann in the shoulder with the bucket of the excavator, though this is disputed. Mr. Hamann testified that during all of this, the excavator never crossed back onto the Hamanns' side of the property line.

[¶7]    Mr. Hamann then brought this action against HMID and Mr. Watts. His first cause of action was against HMID for inverse condemnation. He alleged that by virtue of Mr. Watts and Mr. Unruh's conduct, HMID had "effectively taken possession of, occup[ied] without permission, damaged or substantially diminished the use or value" of Mr. Hamann's property. Mr. Hamann argued HMID was "liable for the conduct of [Mr. Watts and Mr. Unruh] as its employees who were acting as employees and agents on behalf of [HMID]." Mr. Hamann also brought claims against Mr. Watts under 42 U.S.C. § 1983 in his individual and official capacities.

---

[1] The bowl is "a water bowl used to deliver irrigation water to Riolo's property."

2

[¶8] HMID and Mr. Watts moved for summary judgment.[2] HMID primarily argued that because its board did not authorize Mr. Watts's conduct, HMID was not liable for it. Specifically, HMID asserted the "HMID Board of Commissioners never took action to authorize Defendant Watts to enter onto Plaintiff's property for any purpose other than work on the water bowl. Absent an act by the Board authorizing Watts to enter Plaintiff's real property, Plaintiff's claim against HMID for inverse condemnation is legally deficient." HMID relied on Wyoming public meetings laws to argue it could not act except through its board at a public meeting, and any actions by individuals purportedly acting on behalf of HMID, or by the board outside of such a meeting, were void.

[¶9] Mr. Hamann asserted there was "a material issue of fact in controversy as to whether Defendant Watts was on the Hamann property that day acting under the scope, authority and direction of HMID's board." He argued Mr. Watts, at minimum, had authority from HMID to be on Mr. Hamann's property to work on the Riolo bowl. Mr. Hamann pointed to Mr. Watts's deposition where Mr. Watts explained he went onto the Hamann property on June 28 after communicating with the board, its attorney, and Mr. Hamann's attorney. Mr. Hamann also relied on Mr. Watts's testimony that following his initial argument with Mr. Hamann, he called HMID's attorney, who instructed him to use his discretion and do what he felt was necessary to complete his work on the Hamann property that day. Mr. Hamann asserted HMID's attorney was authorized as HMID's agent to give Mr. Watts those instructions. In sum, Mr. Hamann argued the scope of authority granted to Mr. Watts and Mr. Watts's credibility were issues of fact, making summary judgment improper.

[¶10] The district court heard argument on the motions and issued a written decision. The court found HMID had "incorporated the Public Meetings Act into its organizational bylaws and . . . made the provisions of that act applicable to its operations." The court further determined "HMID has shown through deposition testimony that the district did not take any official action, or any action at all, that allowed Mr. Watts to go on [Mr. Hamann's] land." In making this determination, the district court held the actions of HMID's attorney, an individual board member, or the entire board acting in an executive session that was not a public meeting, did not constitute "action" by HMID's board and thus were legally incapable of giving Mr. Hamann authority to act as he allegedly did on June 28. Consequently, the court held Mr. Hamann's inverse condemnation claim against HMID could not survive summary judgment.

---

[2] Mr. Hamann initially appealed the district court's grant of summary judgment to both defendants, but this Court later dismissed Mr. Watts from this appeal on Mr. Hamann's motion. Additionally, Mr. Hamann does not argue against the dismissal of his 42 U.S.C. § 1983 claims in his appellate briefing. Therefore, we only discuss the parties' arguments as they pertain to Mr. Hamann's inverse condemnation claim against HMID.

[¶11] This appeal followed.

## STANDARD OF REVIEW

[¶12] An order granting summary judgment is subject to a familiar standard of review:

> The district court's decision to grant summary judgment . . . "is proper only when there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law." *Hulse v. First Am. Title Co. of Crook Cnty.*, 2001 WY 95, ¶ 25, 33 P.3d 122, 131 (Wyo. 2001). "A material fact is one that would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties." *Colton v. Town of Dubois*, 2022 WY 138, ¶ 10, 519 P.3d 976, 979 (Wyo. 2022) (quoting *Spence v. Sloan*, 2022 WY 96, ¶ 22, 515 P.3d 572, 579 (Wyo. 2022)). We review the district court's decision de novo and afford no deference to the district court. *Id.* We review a summary judgment by reviewing the same materials and using the same legal standard as the district court. *Id.* "We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record." *Hulse*, ¶ 25, 33 P.3d at 131.

*Tilden v. Jackson*, 2025 WY 57, ¶ 12, 568 P.3d 1197, 1202 (Wyo. 2025). The parties' arguments on appeal reveal differing interpretations of Wyo. Stat. Ann. § 1-26-516 (2023). To the extent we must interpret that statute, "[q]uestions of statutory interpretation are subject to de novo review." *Bankers Standard Ins. Co. v. JTEC, Inc.*, 2025 WY 51, ¶ 12, 567 P.3d 1183, 1187 (Wyo. 2025) (citing *Sinclair Wyo. Refin. Co. v. Infrassure, Ltd.*, 2021 WY 65, ¶ 10, 486 P.3d 990, 994 (Wyo. 2021)).

## DISCUSSION

[¶13] Wyo. Stat. Ann. § 1-26-516 provides a statutory cause of action for inverse condemnation:

> When a person possessing the power of condemnation takes possession of or damages land in which he has no interest, or substantially diminishes the use or value of land, due to activities on adjoining land without the authorization of the owner of the land or before filing an action of condemnation, the owner of the land may file an action in

4

district court seeking damages for the taking or damage and shall be granted litigation expenses if damages are awarded to the owner.

In *Bush Land Development Company v. Crook County Weed & Pest Control District*, we distinguished inverse condemnation from the typical eminent domain case:

> Eminent domain is the "'power of the sovereign to take private property for the public use without the owner's consent.'" 4 Tiffany Real Prop. § 1252 (3d ed. 2016). The government's power of eminent domain is exercised through condemnation proceedings. *See id.* However, when the government takes private property without using formal condemnation proceedings, a landowner can bring an inverse condemnation action to recover just compensation. *United States v. Clarke*, 445 U.S. 253, 257, 100 S. Ct. 1127, 1130, 63 L. Ed. 2d 373 (1980). The United States Supreme Court explained in *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304, 316, 107 S. Ct. 2378, 2386, 96 L. Ed. 2d 250 (1987): "While the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings."

2017 WY 12, ¶ 9, 388 P.3d 536, 540 (Wyo. 2017).

[¶14] The parties' stances on when, if ever, a government employee's conduct may result in inverse condemnation liability under Wyo. Stat. Ann. § 1-26-516 differ greatly. Mr. Hamann asserts an employee's conduct is authorized by a governmental entity possessing the power of condemnation when his conduct is "fairly chargeable" to the entity. He further argues that an employee's conduct is fairly chargeable to the entity when the employee acts within the general scope of his duties.[3] Conversely, HMID

---

[3] HMID argues Mr. Hamann did not sufficiently raise this issue below for us to consider it on appeal. While Mr. Hamann cites federal takings cases that he did not rely on below, we note that Mr. Hamann has consistently relied on the theory that HMID is liable for Mr. Watts's conduct while acting within the scope of his duties as HMID's manager. This is illustrated by Mr. Hamann's succinct statement in his brief in opposition to HMID's summary judgment motion that "[t]here is a material issue of fact in controversy as to whether Defendant Watts was on the Hamann property that day acting under the scope, authority and direction of HMID's board." Accordingly, the district court had clear notice of Mr. Hamann's legal theory, and we reject HMID's argument that Mr. Hamann raises this issue for the first

argues that it, and not Mr. Watts or Mr. Unruh, possessed the "power of condemnation" identified in Wyo. Stat. Ann. § 1-26-516. According to HMID, Mr. Watts and Mr. Unruh's conduct can only be attributed to HMID if its board took "action," as the term is defined in Wyo. Stat. Ann. § 16-4-402(a)(i) (2023),[4] to specifically authorize that conduct. HMID's argument was accepted by the district court and appears to be the basis for its grant of summary judgment to HMID on Mr. Hamann's inverse condemnation claim.

[¶15]  HMID's narrow stance on liability is notably inconsistent with the very purpose of the inverse condemnation statute: to provide a means for landowners to seek compensation when the government forgoes formal action. *See Bush Land Dev. Co.*, 2017 WY 12, ¶ 11, 388 P.3d at 540 ("Inverse condemnation is distinct from eminent domain. . . . [It] is a cause of action a landowner may pursue to recover just compensation for a taking of his or her property ***when condemnation proceedings have not been instituted***.") (emphasis added) (quoting *Conner v. Bd. of Cnty. Comm'rs, Natrona Cnty.*, 2002 WY 148, ¶ 30 n.10, 54 P.3d 1274, 1285 n.10 (Wyo. 2022)); *see also* 27 Am. Jur. 2d *Eminent Domain* § 684 (May 2025 Update) ("[Inverse condemnation] is available where private property has been taken in fact for public use, although not through formal eminent domain procedures; and it appears that the taker does not have the intention, willingness, or ability to bring such proceedings.") (footnotes omitted).

[¶16]  We have previously observed that "[i]nverse condemnation which is generally a physical taking in fact, as opposed to a taking by formal procedure, can involve situations where the government ***or those acting under government auspicies*** [sic] physically occupy all or part of a private estate in land." *Cheyenne Airport Bd. v. Rogers*, 707 P.2d 717, 729 (Wyo. 1985) (emphasis added). As a practical matter, a governmental entity "can act only through its agents[.]" *Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 687-88, 69 S.Ct. 1457, 1460, 93 L.Ed. 1628 (1949)). The unintended consequences of those agents' conduct may create inverse condemnation liability. *See Cheyenne Airport Bd.*, 707 P.2d at 729 ("Perhaps the clearest example of an inverse condemnation occurs when the government floods private property without the prior payment of compensation. Less clear but still covered situations would include intrusions on private property by members

_____

time on appeal. *See Amadio v. Amadio*, 2025 WY 21, ¶ 34, 564 P.3d 259, 269 (Wyo. 2025) (explaining that our rule against addressing arguments for the first time on appeal is driven by the rationale that "[i]t is not appropriate for this Court to reverse a district court ruling on grounds that were never presented to it.") (quoting *Traylor v. Kraft*, 2024 WY 74, ¶ 68, 552 P.3d 351, 364 (Wyo. 2024)).

[4] Under § 16-4-402(a)(i), "'Action' means the transaction of official business of an agency including a collective decision, a collective commitment or promise to make a positive or negative decision, or an actual vote upon a motion, proposal, resolution, regulation, rule, order or ordinance at a meeting[.]" "Actions" can only be taken at a public meeting, and an action purportedly taken outside of such a meeting "is null and void and not merely voidable." Wyo. Stat. Ann. § 16-4-403(a) (2023).

of the public pursuant to governmental authorization.") (citation omitted). While formal eminent domain proceedings necessarily result from deliberate government action, inverse condemnation accounts for situations where the government acts without such deliberation. *See Bush Land Dev. Co.*, 2017 WY 12, ¶¶ 8-11, 388 P.3d at 539-40.

[¶17]  For these reasons, we reject HMID's proposition that the "tak[ing] possession of or damag[ing] land . . . or substantially diminish[ing] the use or value of land" that would give rise to inverse condemnation liability under Wyo. Stat. Ann. § 1-26-516 must relate to an "action" as defined in Wyo. Stat. Ann. § 16-4-402(a)(i). That statutory definition, used to describe the open conduct of public business during public meetings, cannot be used to shield governmental entities from liability for the authorized conduct of their agents.[5]

[¶18] An inverse condemnation suit is more appropriately described as "an action seeking redress for the government's action in limiting property rights that was ***an intended or foreseeable result of authorized government action***." 27 Am. Jur. 2d *Eminent Domain* § 687 (May 2025 Update) (emphasis added). To "[a]uthorize" means "[t]o give legal authority; to empower," or "[t]o formally approve; to sanction[.]" *Authorize*, Black's Law Dictionary (12th ed. 2024).

[¶19]  The extent to which a governmental entity has authorized its agent's conduct is typically fact-specific. *Cf. Elsner v. Campbell Cnty. Hosp. Dist.*, 2025 WY 37, ¶ 57, 566 P.3d 894, 910 (Wyo. 2025) (explaining that in the context of the Wyoming Governmental Claims Act, the scope of an agent's authority is a question of fact); *Peterson v. Mertain Health, Inc.*, 2022 WY 54, ¶ 33, 508 P.3d 696, 708 (Wyo. 2022) (explaining that under agency law, the scope of an agent's authority is a question of fact). Such is the case here. The extent of Mr. Watts's authority to conduct HMID business on the Hamann property was heavily disputed. HMID's bylaws provide that its board has the power to "[m]anage and conduct the affairs and business of the District" and to "[e]mploy such agents, attorneys, officers, and employees as may be required, and prescribe their duties[.]" The bylaws further provide that the board will hire a manager, who "shall have general charge of the District and employment of personnel thereon. . . . The manager may employ and appoint such other employees as may be required and prescribe their duties and fix their compensation." These provisions contemplate that HMID's board will delegate certain responsibilities to various agents, including a manager, who will have certain discretion to act on behalf of HMID and direct others to do the same. The extent of HMID's

---

[5] The Public Meetings article of the Uniform Municipal Fiscal Procedures Act contains the following statement of purpose: "The agencies of Wyoming exist to conduct public business. Certain deliberations and actions shall be taken openly as provided in this act." Wyo. Stat. Ann. § 16-4-401 (2023). If agencies were permitted to escape inverse condemnation liability based on their failure to formally order the taking or damaging of property, they would be incentivized to take *fewer* actions at public meetings, which is directly contrary to the legislative purpose of requiring public meetings. *See id.*

delegation to Mr. Watts and the extent of Mr. Watts's discretion present questions of fact that cannot be resolved on the summary judgment record before us.

[¶20] Several witnesses testified that Mr. Watts was not authorized to perform any work other than the limited Riolo bowl work to which Mr. Hamann consented. HMID's attorney stated she did not know of the board giving any direction to Mr. Watts regarding the scope of his access to the Hamann property. Patricia Nelson, a member of HMID's board testified Mr. Watts did not have permission to go to the Hamann property for any reason on June 28. Brian Duyck, a member of HMID's board and the board's president at the time of the events in question, testified that an employee could not obtain authority to do anything without a majority vote of the board.

[¶21] The record also supports a broader view of Mr. Watts's authority. While Ms. Nelson stated Mr. Watts had no express authority to go to the Hamann property on June 28, she also explained that the board does not oversee all the day-to-day activities of its employees:

> Q. What is the policy of the board, if you know, regarding dispatching any employee of the Irrigation District to any location?
>
> .   .   .
>
> [A.] The board does usually not get involved in where the crew is going on any particular day at any particular time. They have their own list of to-dos and when to do it.
>
> .   .   .
>
> Q. But you testified earlier that he—that Randy Watts did not have permission that day to go to the Hamann property.
>
> A. That is correct.
>
> Q. Had he been instructed by the board or anyone, to your knowledge, from the Irrigation District to not go up there?
>
> A. Not to my knowledge.

8

> Q. Then why couldn't he have went up there on his own?
>
> A. I assumed he could.

Travis Jackson, another HMID board member, testified that the manager's role is supervised by the board "[t]o the extent that it is written in the rules and regulations," and that he had not ever directly supervised Mr. Watts's work, but had occasionally gone out to job sites and "looked at the work being done." Board member Scott Hecht, when asked whether HMID's board supervises its manager, responded "[w]e don't supervise him. We set policies and procedures." Mr. Watts claimed, "as long as [he] followed the rules and regulations, [he] was given a great deal of latitude to perform [his] construction abilities[.]" One employee of HMID also testified that the board "usually go[es] along with the manager's suggestions."

[¶22] In addition to evidence showing Mr. Watts had general discretion as HMID's manager, there was evidence Mr. Watts was specifically authorized to access Mr. Hamann's property beyond the Riolo bowl on June 28. Mr. Watts testified that prior to June 28, he "was instructed that Mr. Hamann was going to allow us entire access to that side of the lateral," and that "Mr. Hamann had allowed access to go onto his property and that he would create the gates and that we would be able to use the easement." Mr. Watts claimed he developed this understanding through discussions with HMID's attorney, the board's president, and the board as a whole. Mr. Watts explained he was aware of the dispute between Mr. Hamann and HMID regarding the easement, but he was led to believe the dispute was resolved when he was allowed to go onto the Hamann property on June 28. Mr. Watts also explained that following his initial dispute with Mr. Hamann when he first arrived at the property, he called HMID's attorney and the board's president. According to Mr. Watts, the president told him to "[t]ake the fences down" and "[d]o what [he] need[ed] to do," while the attorney told him to "use [his] discretion as the manager to proceed."[6]

[¶23] We are required to view the record in the light most favorable to Mr. Hamann as the party opposing summary judgment. *Tilden*, 2025 WY 57, ¶ 12, 568 P.3d at 1202. After reviewing the entire record, we conclude there is a genuine issue of material fact as to whether Mr. Watts's conduct was "an intended or foreseeable result of authorized government action." 27 Am. Jur. 2d *Eminent Domain* § 687.

---

[6] HMID argues these alleged instructions by the board, its president, and its attorney were insufficient to authorize Mr. Watts to proceed with the fence removal and other actions he took on June 28. Much of the basis for this argument is HMID's claim that it could only authorize Mr. Watts to take action of any kind at a public meeting, which we have already rejected. Whether Mr. Watts had authority from HMID based on these instructions, his discretionary authority as HMID's manager, or any other alleged source of authority is a question of fact to be resolved at trial.

[¶24] We note another issue that could be relevant on remand. The inverse condemnation statute, Wyo. Stat. Ann. § 1-26-516, provides compensation only when the government "takes possession of or damages land in which he has no interest, or substantially diminishes the use or value of land, ***due to activities on adjoining land*** . . . ." (emphasis added). In *Waid v. State ex rel. Dep't of Transp.*, we interpreted this language to require that government activities giving rise to an action for inverse condemnation must occur on adjoining land. 996 P.2d 18, 24 (Wyo. 2000). In that case, we affirmed the district court's summary judgment against the plaintiff because the government activity in question was conducted on a non-adjoining parcel. *Id.* Here, the record suggests that much of Mr. Watts's June 28 activity occurred on the Hamann property. However, Mr. Hamann testified that after Mr. Watts took over the excavator from Mr. Unruh and drove it onto the neighboring property, he did not cross back onto the Hamann property, even as he was removing the fences on the western boundary line. Additionally, those acts that did occur on the Hamann property appear to have been in the area of an alleged easement. The extent of damage to Mr. Hamann's property that occurred "due to activities on adjoining land" is not clear from the record and thus remains an issue of fact in this case. *See Waid*, 996 P.2d at 24; *Tilden*, 2025 WY 57, ¶ 12, 568 P.3d at 1202 ("A material fact is one that would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties.") (quoting *Colton*, 2022 WY 138, ¶ 10, 519 P.3d at 979).

## *CONCLUSION*

[¶25] The record in this case evidences genuine issues of material fact pertaining to Mr. Hamann's inverse condemnation claim. We therefore reverse the district court's order granting HMID summary judgment on that claim, and remand for further proceedings consistent with this opinion.