**MURMUR CORPORATION and Murmur Leasing Corporation, Appellants,**

v.

**The BOARD OF ADJUSTMENT OF the CITY OF DALLAS and the City of Dallas, Texas, Appellees.**

No. 05–85–00528–CV.

Court of Appeals of Texas, Dallas.

Sept. 11, 1986.

Rehearing Denied Oct. 27, 1986.

Robert L. Meyers, III, Barry R. Knight, Dallas, for appellants.

Donald R. Postell, Dallas, for appellees.

P. Michael Jung, Dallas, amicus curiae.

GUITTARD, Chief Justice.

Murmur Corporation brought this suit in a district court of Dallas County to review an order of the Board of Adjustment of the City of Dallas terminating immediately Murmur's alleged nonconforming use of certain land as a lead smelter. Murmur also sought a declaratory judgment establishing its right to operate the smelter and damages for interference with its operation. The trial court denied all relief sought by Murmur and issued a permanent injunction restraining operation of the smelter. On this appeal Murmur asserts that operation of the smelter is not a nonconforming use subject to termination because the ordinance restricting the use is void for lack of the statutory notice and, alternatively, that, if valid, it does not apply to preexisting uses. Murmur further contends that if the restriction of the use is effective, the board's order is void because

it fails to allow a proper period for amortization of the value of the nonconforming structure before termination, as provided by the Dallas Development Code. We hold that the ordinance is valid and applicable to operation of the smelter, that Murmur is entitled to continue the use during the period required for recoupment of its investment in the nonconforming use, and that the board's order of immediate termination is an abuse of its discretion because there is no substantial evidence supporting an implied finding that Murmur has no investment in the nonconforming structure. Accordingly, we reverse.

### Facts

In 1984 Murmur acquired 26.7 acres of land from RSR Corporation. The purchase included a lead-reclamation smelter on approximately 6.5 acres of the property, a battery-wrecking facility, and a lead-fabrication facility. The lead-reclamation smelter was operating before 1952, when the property was annexed by the city. In 1957 the property was zoned Manufacturing–2 (M–2) under the city's zoning ordinance. In 1965 this zoning classification was changed to Industrial–3 (I–3). Either classification permitted the operation of the plant. RSR acquired the property in 1971. Then, on October 2, 1974, the zoning ordinance was amended to require a specific-use permit for metal smelting and plating operations in I–3 zoned districts. The amendment was passed by the Dallas City Council as a republication of the comprehensive zoning ordinance; however, it is alleged that no notice of the amendment was given as required by article 1011f(b) of the Texas Revised Civil Statutes (Vernon Supp.1986). RSR continued to operate the plant without obtaining the specific-use permit required by the ordinance.

Meanwhile the Federal Trade Commission had begun an investigation of possible antitrust violations by RSR. In 1976 the FTC ordered that the property be sold to increase competition in the industry. No purchaser was found. After the divestiture order, RSR allowed the plant to deteriorate, and the emission level of pollutants rose above the environmental safety standards. In 1983, RSR was ordered by a district court of Dallas County to undertake certain clean-up activities and to install pollution-control devices. RSR declined to install the devices and closed the plant. On February 27, 1984, the court issued an order prohibiting RSR from operating the plant until the pollution-control devices were installed in compliance with the 1983 order.

On May 23, 1984, Murmur acquired the property for $25,000 at a public auction sale ordered by the FTC. The next day, May 24, the city announced its plans to request that the board of adjustment terminate the nonconforming use on the 26.7–acre tract. After a hearing on September 6, 1984, the board unanimously voted to terminate the use of the land as a lead smelter and determined the date of September 6, 1984, to be the termination date. Murmur then sought review by certiorari in the district court pursuant to article 1011g of the Texas Revised Civil Statutes (Vernon Supp.1986), and also sought damages and declaratory relief. At the trial the entire record before the board was introduced in evidence and Murmur presented additional testimony. The judge upheld the board's order and filed a written opinion stating his findings and conclusions.

### Validity of Ordinance

Murmur's only attack on the validity of the zoning ordinance is its contention that the city failed to give the statutory notice required by article 1011f(b) of the Texas Revised Civil Statutes (Vernon Supp.1986) when it adopted the 1974 amendment to the Dallas zoning ordinance. We conclude that the ordinance is not subject to attack in this ground. Since the adoption of the 1974 amendment, the legislature has enacted four validating statutes. TEX.REV.CIV.STAT.ANN. arts. 974d–22 § 4, 1174a–10 § 2(b), 1174a–11 § 2(b), 1174a–12 § 2(b), (Vernon Supp.1986). Murmur argues that the validating acts were

designed only to validate city enactments that otherwise complied with state law, but were invalid because of defects in the cities' charters. We disagree. "Validation acts are remedial and are to be liberally construed." *Leach v. City of North Richland Hills,* 627 S.W.2d 854, 858 (Tex.App. —Fort Worth 1982, no writ). They apply to adoption of amendatory zoning ordinances. *Leach,* 627 S.W.2d at 857; *City of Hutchins v. Prasifka,* 450 S.W.2d 829, 833 (Tex.1970). Although validation statutes may not cure constitutional defects, they may cure defects that do not render the ordinance unconstitutional. *Id.* The right to have notice and appear before a zoning commission is a statutory right, not a due-process requirement. *Eudaly v. City of Colleyville,* 642 S.W.2d 75, 77 (Tex.App.— Fort Worth 1982, writ ref'd n.r.e.). Because the irregularity in the adoption of the 1974 amendment to the zoning ordinance did not affect a constitutional right, we conclude that it was the intention of the legislature to cure this type of defect and that the ordinance was validated. *City of Hutchins v. Prasifka,* 450 S.W.2d 829, 833 (Tex.1970).

■ Moreover, Murmur, as a subsequent purchaser of property subject to a nonconforming use, had no standing to complain of lack of notice to the former owner. *Leach,* 627 S.W.2d at 857.

### Prospective Operation of Zoning Amendment

Before 1974, metal smelters were permitted in districts zoned I–3. By an amendment of that year to the Dallas Zoning Ordinance, "Smelting and Plating of Metals" was specifically listed for the first time in section 10–220, entitled "Approved New and Unlisted Uses." This section permits "Smelting and Plating of Metals" in an I–3 district, but requires a specific-use permit.

■ Murmur contends that this amendment was intended to apply only prospectively and, therefore, did not apply to the pre-existing smelter in question. We do not agree. The ordinance applies by its terms to all uses described. It is prospective in the sense that it requires specific-use permits to be obtained for future operations, although that requirement applies to existing uses as well as new uses. Although the smelting operation was not a "new use," it was otherwise an "unlisted use," and, therefore, was appropriately listed among "Approved New and Unlisted Uses" in section 10–220.

Murmur further contends that an intention not to apply section 10–220 to existing uses is shown by section 10–1401 of the same ordinance under the caption "Classification of New and Unlisted Uses." This section provides:

It is recognized that new types of land use will develop and that forms of land use not anticipated will seek to locate in the City of Dallas. In order to provide for such changes and contingencies a determination as to the appropriate classification of any new or unlisted form of land use shall be made as follows: ....

Then follow provisions concerning the procedure for classifying "any new or unlisted form of land use."

We conclude that section 10–1401 only provides a procedure for classifying uses not otherwise classified. It does not limit or qualify the provisions of section 10–220 classifying "Smelting and Plating of Metals" as permitted in I–3 districts and requiring a specific-use permit.

■ Of course, even though the 1974 amendment required a specific-use permit for existing smelting operations, such a requirement could not be enforced against a preexisting operation without an order terminating the nonconforming use as otherwise provided by the ordinance. Thus the operator of a smelter could lawfully continue that operation without a specific-use permit until that use was terminated by order of the Board of Adjustment. We hold that the zoning ordinance as amended applies to the preexisting use of the property as a lead smelter and establishes this as a nonconforming use subject to termination unless a specific-use permit is granted.

### Termination of Nonconforming Uses—The General Law

■ Murmur attacks the board's order on the ground that it failed to follow the proper standard for terminating the alleged nonconforming use. It argues that the board is authorized to terminate a nonconforming use only after allowing the use to continue for a sufficient time to recover the "full value" of the nonconforming structure, which it interprets to mean market value or replacement value, and, therefore, that the board could not properly limit the allowance to Murmur's actual investment in the nonconforming use. Upon consideration of the applicable provisions of the Dallas Development Code in the light of the general law of zoning, we conclude that recoupment of the investment is a permissible standard.

The leading Texas authority on termination of nonconforming uses is *City of University Park v. Benners*, 485 S.W.2d 773, 777–78 (Tex.1972). In *Benners* the supreme court approved the amortization technique of terminating nonconforming uses and limited the tolerance period required for amortization of a nonconforming use to the time necessary for recoupment of the landowner's investment in the structure at *the time of the zoning change.* The *Benners* opinion explains:

> There are strong policy arguments and a demonstrable public need for the fair and reasonable termination of nonconforming property uses which most often do not disappear but tend to thrive in monopolistic positions in the community. We are in accord with the principle that municipal zoning ordinances requiring the termination of nonconforming uses under reasonable conditions are within the scope of municipal police power; and that property owners do not acquire a constitutionally protected vested right in property uses once commenced or in zoning classifications once made.
>
> * * * * * *
>
> As noted earlier, there is no difference in kind between terminating a land use which pre-dates a zoning change, with

allowance for recoupment, and restricting future land uses not presently utilized. The former requires no more than that the property owner be placed in the equivalent position of the latter, i.e., that he be afforded an opportunity to *recover his investment in the structures theretofore placed on the property.* The reasonableness of the opportunity for recoupment thus afforded is to be measured by conditions at the time the existing use is declared nonconforming and not, as viewed by the intermediate court, by conditions upon expiration of the tolerance period.

485 S.W.2d at 778–79 (emphasis added).

The *Benners* decision was interpreted in *Lubbock Poster Co. v. City of Lubbock,* 569 S.W.2d 935, 941–42 (Tex.Civ.App.— Amarillo 1978, writ ref'd n.r.e.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979), to exclude consideration of market value in determining the sufficiency of the recoupment period allowed by an ordinance requiring removal of billboards. After holding that the owner was entitled to an opportunity to recoup its investment in the structures and also the removal costs directly attributable to the regulatory effect of the ordinance, the court held:

> However, we conclude that *Benners* necessarily precludes recoupment or recovery of the market value or any conformity cost of the structures as essential considerations in determining the question of reasonableness by requiring only that the owner be afforded a reasonable opportunity to recoup or recover his investment in the structures.

*Id.* at 942.

The *Benners* opinion cites cases from eleven jurisdictions as supporting the "prevailing view" that involuntary termination of a nonconforming use after allowing a period of amortization for recoupment of the investment in the nonconforming structure does not amount to a taking in the constitutional sense. 485 S.W.2d at 777. None of the authorities cited requires that the landowner be allowed to recover the market value of the nonconforming struc-

ture, as distinguished from his pre-zoning investment in the structure or in the nonconforming use. If the owner is entitled to recoup only his "investment in the structure," then that amount is the measure of "full value" rather than the market value or any other measure of value, as the Amarillo court of appeals expressly held in the *Lubbock Poster* case.

### Termination of Nonconforming Uses—The Ordinance

We now turn to the question whether the Dallas city council has provided a more generous measure of recoupment for a nonconforming landowner than that required by *Benners* and the other authorities cited. The authority of the board of adjustment is found in the following provisions of the Dallas Development Code:

SEC. 51–3.102 BOARD OF ADJUSTMENT.

... (c) *Powers and Duties.* The board has the following powers and duties which must be exercised in accordance with this chapter ... (4) to bring about the discontinuance of a nonconforming use under a plan whereby the full value of the structure can be amortized within a definite time period; ....

\*   \*   \*   \*   \*   \*

SEC. 51–4.704. NONCONFORMING USES AND STRUCTURES.

(a) *Termination of nonconforming uses.*

(1) the board shall provide a termination date for nonconforming uses having due regard for the investment in the nonconforming use.

DALLAS, TEXAS, DALLAS DEVELOPMENT CODE §§ 51–3.102(c)(4), 51–4.-704(a)(1) (1983).

These sections seem to provide two inconsistent measures of recoupment. Section 51–3.102 calls for amortization of the "full value of the structure," and section 51–4.704 requires the board to have "due regard for the investment in the nonconforming use." We reconcile these terms by holding that in this context "full value of the structure" may be taken to mean

actual dollars invested in the nonconforming structure, although the term "investment in the nonconforming use" may also include other costs such as the cost of removing a nonconforming structure and establishing the business in a different location. *See Lubbock Poster Co. v. City of Lubbock,* 569 S.W.2d 935, 942 (Tex.Civ. App.—Amarillo 1978, writ ref'd n.r.e.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979); *White v. City of Dallas,* 517 S.W.2d 344, 348–49 (Tex.Civ.App.—Dallas 1974, no writ).

■ We reach this conclusion for several reasons. In the first place, "investment" is a more precise term than "value." "Investment" is ordinarily used in the sense of cost—actual dollars, or their equivalent, expended in exchange for the property in question—an amount susceptible of exact computation. "Value" on the other hand is a word of many meanings, as recognized by Justice Brandeis and other eminent authorities. *Kimball Laundry Co. v. United States,* 338 U.S. 1, 5, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765 (1949); *Southwestern Bell Telephone Co. v. Public Service Comm'n,* 262 U.S. 276, 310, 43 S.Ct. 544, 554, 67 L.Ed. 981 (1923) (Brandeis, J., dissenting); 12 Nichols, LAW OF EMINENT DOMAIN, § 12.32[2] at 12–545 (1985). Consequently, its meaning in a particular case depends on the context. In the eminent-domain context it is taken to mean market value except in rare cases when no market value can be ascertained. *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 474, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973); *City of Austin v. Canizzo,* 153 Tex. 324, 267 S.W.2d 808, 812 (1954). In the field of utility regulation "fair value" may mean the depreciated original cost, or the replacement cost less depreciation, or a combination of the two. *Southwestern Bell Telephone Co. v. Public Utility Comm'n,* 571 S.W.2d 503, 512–515 (Tex.1978) (original cost less depreciation considered in determining "adjusted value of invested capital"); *Railroad Comm'n v. Houston Natural Gas Corp.,* 155 Tex. 502, 289 S.W.2d 559, 572 (1956)

(value of gas main fixed as "a reasonable balance between original cost less depreciation and replacement cost new less an adjustment for present age and condition"); *see Federal Power Comm'n v. Natural Gas Pipeline Co.*, 315 U.S. 575, 593, 62 S.Ct. 736, 746, 86 L.Ed. 1037 (1942) (Brandeis, J., dissenting: amortization of "prudent investment" need make no allowance in excess of costs). For insurance purposes, the standard may be "actual value to the owner," considering market value, original cost, and replacement cost. *Crisp v. Security Nat'l Ins. Co.*, 369 S.W.2d 326, 329 (Tex.1963); *Mew v. J & C Galleries, Inc.*, 554 S.W.2d 249, 251–52 (Tex.Civ.App.—Dallas 1977), *writ ref'd n.r.e.*, 564 S.W.2d 377 (Tex.1978). Since the meaning of "value" depends on the context, we hold that in the context of an ordinance providing for termination of a nonconforming use, "full value" may be taken to mean the actual dollars invested in the nonconforming structure, as declared in *Benners.*

In the second place, in cases such as this one, where the meaning of the provision is doubtful or ambiguous, the board's interpretation should be given weight. *Texans to Save the Capitol, Inc. v. Board of Adjustment*, 647 S.W.2d 773, 776–77 (Tex. App.—Austin 1983, writ ref'd n.r.e.); *Heard v. City of Dallas*, 456 S.W.2d 440, 444 (Tex.Civ.App.—Dallas 1970, writ ref'd n.r.e.); *Rosenthal v. City of Dallas*, 211 S.W.2d 279 (Tex.Civ.App.—Dallas 1948, writ ref'd n.r.e.).

In the third place, this interpretation is consistent with the only two decisions—both by this court—applying the same term "full value of the structure" as used in the predecessor ordinance of the City of Dallas. Without expressly addressing this question, both of these decisions give controlling weight to the term "investment" in the sense of actual cost. *See White v. City of Dallas*, 517 S.W.2d 344, 348–49 (Tex.Civ. App.—Dallas 1974, no writ); *City of Dallas v. Fifley*, 359 S.W.2d 177, 183 (Tex.Civ. App.—Dallas 1962, writ ref'd n.r.e.).

In the fourth place, the alternatives to actual investment as a measure of value are illogical and contradictory in the context of termination of a nonconforming use. A "market-value" standard, as applied in eminent-domain cases, would provide no satisfactory measure because the price a willing purchaser would pay for property to a willing seller is necessarily affected by existing restrictions of use. *See United States v. 320 Acres of Land*, 605 F.2d 762, 818 (5th Cir.1979) (compensation for land taken must be determined in the light of restriction of use); *City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808, 815 (1954) (evidence of value for a use forbidden by zoning is admissible only upon proof that the restriction may be lifted within a reasonable time); *Lakeside Park, Ltd. v. State*, 452 S.W.2d 747, 750 (Tex.Civ.App.—Beaumont 1970, writ ref'd n.r.e.) (zoning restriction material in determining market value); *City of Tyler v. Ginn*, 225 S.W.2d 997, 998 (Tex.Civ.App.—Texarkana 1949, writ dism'd w.o.j.) (zoning ordinance admissible on issue of market value). Since the price a willing purchaser would pay for a nonconforming structure may depend on how long he may expect the nonconforming use to continue, application of the market-value standard would result in a vicious circle: market value depends on the period of expected nonconforming use, and the period of nonconforming use allowed depends on market value. *Cf. Southwestern Bell Telephone Co. v. Public Service Comm'n*, 262 U.S. 276, 292, 43 S.Ct. 544, 548, 67 L.Ed. 981 (1922) (Brandeis, J., dissenting: vicious circle when telephone rates are based on value determined by capitalization of earnings). A valuation based on no limitation of the use would assume the point at issue, namely, the period of nonconforming use to be allowed, just as a valuation based on immediate termination would assume the point at issue by assuming no further nonconforming use.

Cost of replacing the nonconforming structure, even with an allowance for depreciation, would also provide an unsatisfactory measure of recoupment. A landowner is not permitted to extend the period of nonconforming use by replacements or improvements because by that method he

would be able to extend the nonconforming use indefinitely; he is entitled to continue to use the structure as it stood at the time of the zoning change for its normal expected life. *See City of Garland v. Valley Oil Co.,* 482 S.W.2d 342, 346 (Tex.Civ.App.— Dallas 1972, writ ref'd n.r.e.), *cert. denied,* 411 U.S. 933, 93 S.Ct. 1902, 36 L.Ed.2d 392 (1973); *National Advertising Co. v. County of Monterey,* 1 Cal.3d 875, 83 Cal.Rptr. 577, 464 P.2d 33, 36 (1970); *Harbison v. City of Buffalo,* 4 N.Y.2d 553, 152 N.E.2d 42, 46 (1958). Therefore, any replacements of the nonconforming structure, though perhaps not forbidden, must be excluded in determining the amortization period. To allow replacement cost as a measure of the recoupment allowed would thus allow unjustified extension of the nonconforming use. Moreover, allowance of replacement cost as a measure of recoupment would ignore the factor of obsolescence, which might be substantial in the case of an industrial structure like the lead smelter in question. The landowner should not be entitled to recoup the increased cost of replacing an obsolete structure with a similar structure that no prudent investor would erect for use in the business, nor should he be permitted to recoup the cost of replacing an obsolete structure with a new and technologically more advanced facility.

We conclude that since neither market value nor replacement cost provide a satisfactory measure of value of a nonconforming structure, the city council is not likely to have intended to require any measure other than actual dollars invested in determining the "full value of the structure" to be amortized within the recoupment period provided.

In the fifth place, we hold that the actual dollars invested is at least a permissible measure of recoupment under the Code because that measure tends to promote the obvious objective of the Code to eliminate nonconforming uses, as recognized by this Court in *City of Dallas v. Fifley,* 359 S.W.2d at 182, and *White v. City of Dallas,* 517 S.W.2d at 348–49. The continuation of nonconforming uses is obviously contrary to this general objective and is allowed only to relieve any hardship that would otherwise be imposed on owners that have made substantial investments in nonconforming structures before imposition of the restriction. That objective is best advanced by requiring termination of nonconforming uses at the earliest reasonable time.

■ For all the reasons stated, we see no indication in the Code that the Dallas City Council intended to provide a more generous treatment for nonconforming owners, and therefore, a longer period of amortization than that required by the general law of zoning, as declared in *Benners* and the other cases above cited. We are persuaded that the Code can properly be interpreted as requiring only what *Benners* and the other decisions require: a reasonable opportunity to recoup the owner's investment in the nonconforming structure or in the nonconforming use at the time of the zoning change. Consequently we hold that the board and the trial court did not err in considering Murmur's actual investment in the nonconforming structure rather than its market value or some other measure of "full value" in determining the recoupment to which Murmur was entitled before termination of the nonconforming use.

### *"Taking" of Property*

■ Murmur contends that the trial court erred in upholding the board's order and in denying its claim for damages against the city because the board's termination of Murmur's use of the property as a smelter without allowing it to recover the market value or replacement value of the smelter constitutes a taking of its property without due process in violation of article I, section 17 of the Texas Constitution and of the Fifth and Fourteenth Amendments of the United States Constitution.

As explained in the *Benners* opinion and in the out-of-state authorities it cites, the amortization technique for terminating a nonconforming use does not depend on exact compensation for economic loss because

any restriction of uses, present or prospective, may result in economic loss in particular instances. Rather, the amortization technique stems from the requirement that the public good outweighs the private loss and is based on the theory that in order to be reasonable, a regulation terminating a use at the time of the zoning change must minimize the private loss by allowing the nonconforming use to continue after a zoning change for the normal expected life of the nonconforming structure without replacements or improvements so as to give the owner a reasonable opportunity to recoup his investment in the nonconforming use.[1] Only when the limitation of use is unreasonable under the circumstances is it considered to be a taking of property. *Benners*, 485 S.W.2d at 777–78; *cf. City of Corpus Christi v. Allen*, 152 Tex. 137, 254 S.W.2d 759, 761 (1953) (prohibition of automobile wrecking yard in "light industrial district" was unreasonable because benefit to City from prohibition was slight). Limitation of use does not in itself constitute a taking in the constitutional sense unless the owner is left with no substantial use of his property,[2] or unless the limitation constitutes the appropriation of a specific property right for the public benefit. *City of Austin v. Teague*, 570 S.W.2d 389, 393–94 (Tex.1978).

In light of these authorities it is clear that the measure of recoupment for amortization of a nonconforming use is not the same as the measure of compensation for property taken for public use under the law of eminent domain. As a regulation under the police power, it must be judged by the standard of reasonableness, requiring only a reasonable opportunity to recoup the owner's actual investment in the nonconforming use, and need allow nothing for appreciation of the value of land or improvements or for profit from an advantageous acquisition.

In addition to the cases cited in *Benners*, the following authorities support the standard of reasonableness for termination of a nonconforming use on consideration of various factors, including allowance of a reasonable time for amortization of the owner's irrecoverable investment in a nonconforming structure: *Art Neon Co. v. City and County of Denver*, 488 F.2d 118, 121 (10th Cir.1973); *City of Fayetteville v. McIlroy Bank & Trust Co.*, 278 Ark. 500, 647 S.W.2d 439, 441 (1983); *City of Los Angeles v. Gage*, 127 Cal.App.2d 442, 274 P.2d 34, 44 (1954); *Harris v. Mayor and City Council of Baltimore*, 35 Md.App. 572, 371 A.2d 706, 710–11 (1977); *Modjeska Sign Studios, Inc. v. Berle*, 43 N.Y.2d 468, 402 N.Y.S.2d 359, 365, 373 N.E.2d 255, 261 (1977); *Rives v. City of Clarksville*, 618 S.W.2d 502, 509 (Tenn.App.1981). Thus there was no taking of Murmur's property in violation of the state or federal constitutions in limiting the measure of its recoupment to its actual investment. *Benners*, 485 S.W.2d at 779.

### The Standard of Review

Murmur further contends that the board's order terminating the alleged

---

**1.** *Benners* cites the following cases, among others, supporting this view: *National Advertising Co. v. County of Monterey*, 1 Cal.3d 875, 83 Cal.Rptr. 577, 464 P.2d 33, 35–6 (1970); *Board of Supervisors v. Miller*, 170 N.W.2d 358, 362–63 (Iowa 1969); *Spurgeon v. Board of Commissioners*, 181 Kan. 1008, 317 P.2d 798, 805–06 (1957); *Grant v. Mayor and City Council of Baltimore*, 212 Md. 301, 129 A.2d 363, 369 (1957); *Naegele Outdoor Advertising Co. v. Village of Minnetonka*, 281 Minn. 492, 162 N.W.2d 206, 212–13 (1968); *Harbison v. City of Buffalo*, 4 N.Y.2d 553, 176 N.Y.S.2d 598, 603, 152 N.E.2d 42, 46 (1958); *City of Seattle v. Martin*, 54 Wash.2d 541, 342 P.2d 602, 604 (1959).

**2.** *See Hadachek v. Sebastian*, 239 U.S. 394, 412, 36 S.Ct. 143, 146, 60 L.Ed. 348 (1915) (prohibition of use as brickyard was not absolute deprivation of use); *Mile Road Corp. v. City of Boston*, 345 Mass. 379, 187 N.E.2d 826, 830 (1963), *app. dism'd*, 373 U.S. 541, 83 S.Ct. 1538, 10 L.Ed.2d 687 (prohibition of use as dumping ground was not complete deprivation of property); *Cheyenne Airport Board v. Rogers*, 707 P.2d 717, 732 (Wyo.1985) (height limitation in airport approach zone); *cf. Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 414–15, 43 S.Ct. 158, 159–60, 67 L.Ed. 322 (1922) (prohibition of mining coal was practical destruction of reserved mineral rights, not justified by "reciprocity of advantage").

nonconforming use was not supported by substantial evidence that Murmur had recovered either its investment in the structure or the value of the use. The parties agree that the substantial evidence rule is the proper standard for review of the board's order by certiorari in the district court. The board's order is presumed to be valid, and review is limited to the question of its legality. The main question is whether the board's order was an abuse of its discretion. *Nu-Way Emulsions, Inc., v. City of Dalworthington Gardens,* 617 S.W.2d 188–89 (Tex.1981). The court must not substitute its discretion for that of the board, even though the court concludes that the overwhelming preponderance of the evidence is against the board's decision. *City of San Angelo v. Boehme Bakery,* 144 Tex. 281, 190 S.W.2d 67, 70 (1945); *City of Dallas v. Fifley,* 359 S.W.2d 177, 181 (Tex.App.—Dallas 1962, writ ref'd n.r. e.). If reasonable minds could have reached the conclusion that the board must have reached in order to justify its action, the order must be upheld. *City of San Angelo,* 190 S.W.2d at 70; *Texans to Save the Capitol v. Board of Adjustment,* 647 S.W.2d 773, 777–78 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *Swain v. Board of Adjustment,* 433 S.W.2d 727, 730 (Tex.Civ. App.—Dallas 1968, writ ref'd n.r.e.), *cert. denied,* 397 U.S. 977, 90 S.Ct. 1085, 25 L.Ed.2d 274 (1970).

■ When the board must make a determination of fact, as in this case the amount of Murmur's investment in the nonconforming use, the board's finding must be reasonably supported by substantial evidence. *See Swain,* 433 S.W.2d at 730. Moreover, since the board is a quasi-judicial body, its orders should be upheld on any possible theory of law, regardless of the reasons given by the board in rendering its decision. *City of Dallas v. Fifley,* 359 S.W.2d 177, 182 (Tex.Civ.App.—Dallas 1962, writ ref'd n.r.e.). If this case were an attack upon an ordinance terminating a

nonconforming use, as was the case in *Benners, Lubbock Poster,* and *Swain,* then clearly the landowner would have a heavy burden to show that the zoning regulation was arbitrary, capricious, or unreasonable. *See* 485 S.W.2d at 729; 569 S.W.2d at 740; 433 S.W.2d at 735. In that context, the owner would have the burden to prove the amount of his investment. However, since the limitation of use here was by order of the board of adjustment on application of the city, the evidence must be sufficient to justify the board's action. 8A E. McQuillin *The Law of Municipal Corporations* § 25.266, at 329 (1986). The absence or inadequacy of competent evidence to support the decision is ground for reversal. 8A McQuillin § 25.312 at 569.

Moreover, Murmur is entitled to relief if it has established that the board's order did not follow the requirements of this Code authorizing the board "to bring about the discontinuance of a nonconforming use under a plan whereby the full value of the structure can be amortized within a definite period of time" and "to provide a termination date for nonconforming uses having due regard for the investment in the nonconforming use." Therefore, as a basis for an order of termination at a particular date, the board is required to determine from the evidence the value of the nonconforming structure and the investment in the nonconforming use.

It follows that at the hearing before the board, the city had the burden to present substantial evidence to support any finding of fact necessary to support the board's order. Murmur satisfies its burden to show that the order is illegal or an abuse of its discretion if it establishes that there is no evidence from which reasonable minds could have reached the conclusion that the board must have reached in order to justify its order. Accordingly, we have reviewed the record to determine whether it contains any substantial evidence to support the board's order.[3]

---

3. Although not a member of the panel that heard this case originally, the writer has examined the entire record, read the briefs, studied

the authorities cited, and listened to the recorded oral arguments.

We note that Murmur did not attack the order in the trial court, and does not attack it here, on the ground that the order is an abuse of its discretion because the ordinance requires that any plan adopted by the board must allow an amortization period in the future, even when the owner has no investment in the nonconforming use or has already had ample opportunity to recover that investment since the zoning change. Accordingly, we do not consider the abuse-of-discretion question discussed in Justice McCraw's concurring opinion.

### Evidence of Murmur's Investment

The city's testimony before the board consisted principally of the testimony of Mike Levinson, an economist and assistant director of planning and development for the city. Levinson testified that in order to determine Murmur's "unrecoverable costs" invested in the nonconforming use, he subtracted the value of the land if devoted to its conforming highest and best use from the value of the property in its present nonconforming use. In determining Murmur's investment, he considered only the investment on the date the city notified Murmur it was petitioning the board to terminate the nonconforming use because investments after that date should be construed as an attempt to increase the investment subject to amortization. He accepted the purchase price of $25,000 Murmur actually paid for the 26.7 acres. To determine the value of the land, he relied on an appraisal of $2.50 per square foot as the market value of the land for conforming uses if vacant and clear of nonconforming structures. This value, when multiplied by the area of the 6.5 acres occupied by the nonconforming smelter, amounted to $707,850. To determine the value of the land with the smelter on it, he subtracted estimated demolition costs of $225,000 and estimated costs of reconditioning the soil of $504,000, against which he offset the estimated salvage value of the equipment of $500,000. Thus he estimated the present value of the 6.5 acres for its best conforming use to be $478,850. Subtracting the entire purchase price of $25,000, Levinson

estimated that the 6.5 acres was worth $453,850 in excess of Murmur's investment. Thus he concluded that Murmur would have no substantial "unrecoverable costs" as a result of termination of the nonconforming use.

The city also presented the testimony of Mike McClellan, a real estate appraiser, who testified that the value of the land without the smelter on it for its best conforming use would be $2.75 per square foot, which would be more than its value for a conforming use in its present condition with the smelter on it.

Murmur's evidence before the board related to the entire 26.7 acres of land, consisting of several separate tracts including the 6.5-acre tract on which the smelter is located, and all the structures and equipment on the 26.7 acres, all of which, it asserted, should be considered an indivisible economic unit. Murmur's witnesses claimed its investment to be $10,802,197, including various expenses of acquisition, projected costs of complying with the clean-up order in the previous suit, and its contingent liabilities for damage claims against RSR. Its witnesses put the undepreciated book value of the structures, based on RSR's records, at $18,002,199, and estimated a market value of at least that amount. Its experts estimated the undepreciated replacement value at $27,600,000.

In the trial court Murmur presented also the testimony of John Sartain, a consulting economist, who asserted that Levinson's opinion lacked factual support. He also gave his opinion that the figures presented to the board by Murmur's witnesses were inaccurate because Murmur's claimed "investments" included various expenses other than capital improvements and the book values taken from RSR's records made no deduction for depreciation. Sartain testified that the total value of the actual investment in the structures on the 26.7 acres as shown by RSR's books was $8,518,228, for which an amortization period of 18.12 years was required, considering estimated net revenues of $470,000 per year. Sartain said that the land had a

negative value for conforming uses because reclaiming the land would cost more than the land would be worth with the structures removed.[4]

There is also evidence in the record tending to explain why Murmur was able to acquire the entire property for only $25,000. After the Federal Trade Commission ordered the property sold, RSR allowed the property to deteriorate, apparently with the intent to discourage buyers, and a serious pollution problem developed, which prompted a suit against RSR by the city and the state to enforce compliance with environmental safety standards. This suit resulted in an agreed order in October 1983 requiring RSR to install pollution-control equipment at substantial expense. RSR refused to install the pollution-control equipment and closed the plant in February 1984. Although RSR had been operating the plant at a loss, Murmur, before acquiring the plant in May 1984, had to represent to the FTC that it would continue to operate the plant, would install the pollution-control equipment, and would comply with applicable environmental regulations. It also had to assure the State that whenever the smelting operation should be discontinued, it would demolish the smelter and clean up the site. It is understandable, therefore, that although notice of the sale was widely publicized, Murmur's bid of $25,000 was the only bid received.

### Validity of Termination Order

◼ In light of this evidence we conclude that the board's order for immediate termination of the nonconforming use of the 6.5 acres as a lead smelter was an abuse of its discretion because there was no substantial evidence upon which reasonable minds could reach the conclusion that Murmur had no investment in the nonconforming use. The trial court, and, presumably, the board, adopted the reasoning of Levinson and McClellan, the city's experts, who gave their opinions that the market

value of the land without the nonconforming structure was so much greater than Murmur's total investment that even after clearing the site and cleaning it up for sale, Murmur had no "unrecoverable investment" in the smelter.

This testimony does not support the board's order because it uses a legally impermissible measure for recoupment of Murmur's investment in the nonconforming use in that it improperly offsets the value of the land against Murmur's investment. We find no support for such an offset in the *Benners* opinion or in any of the other authorities we have examined. Neither do we find any support for such an offset in the Dallas Development Code. The Code authorizes the board "to bring about the discontinuance of a nonconforming use under a plan whereby the full value of the structure can be amortized within a definite period of time" and to provide a termination date "having due regard for the investment in the nonconforming use." Dallas Development Code, §§ 51–3.102, 51–4.704. Thus, if Murmur has any investment in the nonconforming structure, as distinguished from the land, that has not already been recovered from use of the nonconforming structure, it is entitled to an opportunity to recoup that investment from utilization of the structure itself, by its continued operation or salvage or both, without regard to any profit it might realize from the sale of the land. Accordingly, we hold that the board improperly considered the market value of the land in determining the amount of Murmur's "recoverable costs."

Since the board's order cannot be justified by evidence that Murmur could recover its investment in the nonconforming smelter by selling the land, we must consider whether there is any other evidence in the record supporting the board's order. *See City of Dallas v. Fifley*, 359 S.W.2d 177, 182 (Tex.App.—Dallas 1962, n.r.e.). Arguably, if there is evidence from which

---

**4.** The city objected to Sartain's testimony as improper in a certiorari proceeding under article 1011g(m) of the Texas Revised Civil Statutes (Vernon Supp.1986). We do not consider this question because we find it immaterial to our disposition of the case.

the board could reasonably find that all of Murmur's investment should be allocated to the land and to the other facilities on the 26.7 acres, and none should be allocated to the nonconforming smelter, the order is valid.

We find no basis in this record for such an allocation. We recognize that a structure may be a negative factor in determining the value of land if the land would sell for more without the structure. *State v. Gill*, 519 S.W.2d 514, 516 (Tex.Civ.App.—Texarkana 1975), *rev'd on other grounds*, 531 S.W.2d 322 (Tex.1975). Accordingly, if there is evidence to support an inference that Murmur acquired the property primarily for conforming uses or that continuation of the nonconforming use would be uneconomic in view of the availability of the land for other uses, then the board might properly infer that Murmur had no substantial investment in its use as a lead smelter.

There is no evidence however, that all of Murmur's investment was in the land and other facilities and none in the smelter. The record shows that Murmur acquired the property specifically for use as a lead smelter—indeed it was required, as a condition of the purchase, to make a commitment to the Federal Trade Commission to use it for that purpose and to install whatever equipment might be required to avoid any further violation of applicable environmental standards. Nor is there any evidence that use of the smelter under the conditions of the purchase would be uneconomic. Moreover, Levinson's and McClellan's testimony that the smelter is a negative factor in valuing the property for a conforming use provides no support for the order because it assumes the point at issue—that the land can no longer be used as a lead smelter. Of course, a structure designed for a specific use, as this smelter was, may have little or no value if that use is discontinued. We conclude, therefore, that this record provides no support of an implied finding by the board that Murmur had no substantial investment in the nonconforming use.

In this connection, we note that there is also no evidence in the record showing that a sufficient period had already elapsed after the zoning change in 1974 for amortization of RSR's investment at that time, excluding later additions and improvements, according to *Benners* rule. We need not decide whether the purchaser of land subject to a nonconforming use is entitled to recover his own investment, as distinguished from the investment of the former owner at the time the use became nonconforming, and thus possibly to obtain by his purchase an extension of the allowable amortization period. It is possible that RSR's 1974 investment in the smelter was fully depreciated when Murmur bought it, but there is no evidence supporting such a conclusion. Both parties chose to limit their evidence to Murmur's investment and its value at the time of Murmur's purchase in 1984. Therefore, we have confined our consideration to that issue.

*Judgment*

For the reasons stated, we hold that the board's order for immediate termination of the nonconforming use was an abuse of discretion. Accordingly, we reverse the judgment of the trial court and render judgment vacating the order of the board of adjustment without prejudice to further proceedings before the board consistent with this opinion. We also dissolve the injunction granted by the trial court without affecting the agreed order in the previous case. We express no opinion on the merits of Murmur's claim for damages or whether the trial court has jurisdiction of that claim, but remand the cause to the district court for further consideration consistent with this opinion. *See Currey v. Kimple*, 577 S.W.2d 508, 512 (Tex.Civ.App.—Texarkana 1978, writ ref'd n.r.e.); Tex. Rev.Civ.Stat.Ann. art. 1011g(k), (m) (Vernon Supp.1986).

Reversed and rendered in part and remanded in part.

AKIN, DEVANY, HOLLINGSWORTH, HOWELL, McCLUNG, SCALES, STEWART and VANCE, JJ., join in the majority opinion.

Justice WHITHAM'S concurring opinion is joined by HOWELL, J.

McCRAW, J., concurs with opinion.

STEPHENS, J., concurs in the result only without opinion.

WHITHAM, Justice, concurring.

I concur in the result. I agree that the trial court's judgment be reversed, that we render judgment vacating the order of the board and that we render judgment dissolving the trial court's permanent injunction. I also concur in the majority's disposition of Murmur's claims for damages and attorney's fees based on various alleged violations of both federal and state constitutions by the Board of Adjustment of the City of Dallas and the City of Dallas as urged in Murmur's third, fourth and fifth points of error. I write to express the reasons I concur in the results reached by the majority in reversing the trial court's judgment, vacating the board's order and dissolving the trial court's permanent injunction.

Appellants, Murmur Corporation and Murmur Leasing Corporation, appeal from a judgment in favor of appellees, the Board of Adjustment of the City of Dallas and the City of Dallas, Texas, rendered by a district court, as an appellate court, on writ of certiorari pursuant to TEX.REV.CIV. STAT.ANN. art. 1011g(k) (Vernon Supp. 1986). The judgment (1) affirmed a September 6, 1984 order of the board immediately terminating Murmur's lead smelting use; (2) granted the city's application for a permanent injunction against the smelting use; (3) denied Murmur's application for a permanent injunction against enforcement of the board order; and (4) denied Murmur's suit for damages against the city. In its second point of error, Murmur contends that the trial court erred in affirming the action of the board in terminating Murmur's smelting use because the board failed to follow the proper standard for terminating the nonconforming use. Murmur argues that the board did not correctly apply the applicable provisions of the Dallas Development Code. I agree.

The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), per Mr. Justice Holmes. The natural tendency of human nature to which Mr. Justice Holmes refers remains alive and well. The board heard the public outcry against the evils of lead smelters and allowed the City of Dallas to confiscate private property without compensation. The trial court permitted the confiscation by affirming the decision of the Board of Adjustment of the City of Dallas. I recognize the evils of lead smelters. Nevertheless, I cannot agree to the taking of private property under the guise of the police power. Before the board, Murmur's private property disappeared. Tomorrow, another unpopular property owner may fall victim to the natural tendency of human nature noted by Mr. Justice Holmes. Consequently, I would sustain Murmur's second point of error, reverse the judgment of the trial court, vacate the permanent injunction and render judgment declaring that the September 6, 1984 order of the board is void.

In considering the applicable provisions of the Dallas Development Code, I know that the board met on September 6, 1984, and terminated Murmur's smelting use on that same date. The following provisions of the Dallas Development Code govern:

SEC. 51–3.102 BOARD OF ADJUSTMENT.

\* \* \* \* \* \*

(c) *Powers and Duties.* The board has the following powers and duties which

must be exercised in accordance with this chapter:

\*     \*     \*     \*     \*     \*

(4) to bring about the discontinuance of a nonconforming use under a plan whereby the full value of the structure can be amortized within a definite time period. . . .

\*     \*     \*     \*     \*     \*

SEC. 51–4.704.   NONCONFORMING USES AND STRUCTURES.

(a) *Termination of nonconforming uses.*

(1) the board shall provide a termination date for nonconforming uses having due regard for the investment in the nonconforming use.

DALLAS, TEXAS, DALLAS DEVELOPMENT CODE §§ 51–3.102(c)(4), 51–4.704(a)(1) (1983). I read the above provisions of the Dallas Development Code to require the board: first, to determine the "full value" of a "structure" located upon land, which "structure" is utilized for a purpose not permitted by an applicable zoning ordinance; second, to devise a plan to accomplish the purpose of amortizing that determined "full value" within a definite period of time; and third, to designate a date upon which the use not permitted shall cease, which date shall allow the owner to recoup the "full value" of that structure. Therefore, to my mind, "full value" as that phrase is used in section 51–3.102(c) is the "investment" to be allowed recoupment under section 51–4.704. Moreover, in my view, "investment" as that word is used in section 51–4.704 does not mean Murmur's $25,000.00 purchase price. Since, in my view, the amount of Murmur's purchase price is unimportant to disposition of the question before us, I do not extend this opinion with the background and details of Murmur's acquisition of the smelter. In any event, the $25,000.00 purchase price might evidence a profitable acquisition. On the other hand, that purchase price might reflect poor judgment. Thus, under no circumstances can the $25,000.00 constitute the "investment" representing the "full value of the structure" which the board must determine. Hence, the $25,000.00 cannot establish the fact to be determined by the board; to wit: "the full value of the structure." With that background and viewpoint expressed, I now explain why I would sustain Murmur's second point of error.

Murmur's argument that the board did not correctly apply the applicable provisions of the Dallas Development Code centers on its contention that the board included the value of the land in making certain determinations required of it under the Dallas Development Code. I agree with Murmur that the board did include the value of the land in its determination. The record before the board tells us that the board included the value of the land in its determination. The city relied solely upon the testimony of one of its employees, Mike Levinson, as an economics expert, to terminate immediately Murmur's smelting use without any amortization period. I quote Levinson's presentation before the board:

It's my best professional opinion that the most appropriate technique for deriving a final amortization period for the nonconforming lead smelter is one that considers the amount of unrecoverable cost invested in the use. The unrecoverable cost invested in the use are derived by subtracting the value of the land if devoted to its conforming highest and best use from the value of the property in its present nonconforming use.

To determine the value of the present nonconforming use, it is my recommendation to you that the Board of Adjustment consider only the investment made by Murmur Corporation prior to the date said corporation was notified that the City Attorney's Office was petitioning the Board of Adjustment to provide a termination date for the nonconforming use. Investments occurring after this date should be construed by this Board as an attempt artificially or to falsely induce amortization. I assert that a fair market price was paid for the property in its nonconforming use given the condition of sale and the fact that the proper-

ty was sold at a sale bid public auction to the highest bidder.

Based upon documentation provided to me by this Board and the City Attorney's Office, the acquisition price for the lead smelter was $25,000. To the best of my knowledge, no additional investment was made prior to receiving notice of nonconforming use termination, and considering this fact, that this facility has yet to be operational, $25,000 should stand as the investment value of this nonconforming use. The value of the land, if devoted to a conforming highest and best use, has been determined by an appraiser to be $707,850 simply $2.50 a square foot times the amount of land dedicated to the lead smelter.

However, due to the unique nature of this case, the cost of preparing the—the costs of preparing the land for disposition must be subtracted from this appraised value. These costs are principally those associated with reconditioning of the soil, estimated at $504,000, as well as the cost of demolition estimated at $225,000.

Finally, the salvage value of equipment estimated to be at least $500,000 must be added to the equation in an effort to capture the true value of the property in its conforming use. Therefore, the estimated value of its land in its conforming and highest and best use is $478,850. Given the estimate of the true value of the land in its conforming use at $478,850, one must subtract that the investment of $25,000 from this figure. This difference is $453,850, representing potential before tax cash flow to the property owner from reversion, and therefore indicating that there are no unrecoverable costs to speak of. In the absence of unrecoverable cost, there is no justification for granting an amortization period for the nonconforming use. Thank you.

Thus, Levinson's approach can be charted as follows:

| Line 1 | Value of smelter | $25,000.00 |
|--------|------------------|------------|

Less: Value of land with smelter removed:

| Line 2 | $2.50/square foot | $707,850.00 |
|--------|-------------------|-------------|
| | Closure costs for 6.5 acre | |
| Line 3 | smelter tract | −$504,000.00 |
| Line 4 | Demolition costs | −$225,000.00 |
| Line 5 | Salvage value | +$500,000.00 |
| Line 6 | Sum of Lines 2 through 5 | +$478,850.00 |
| | Murmur's investment in | |
| Line 7 | use (Line 1 minus Line 6) | −$453,850.00 |

Furthermore, since the land in question was only a part of a larger tract owned by Murmur, the board made certain that the value of the land they used in their determination was only the value of the land devoted to the offending smelter use. This concern of the board appears from the following colloquy between Levinson and members of the board:

THE CHAIR: Mr. Levinson, could I ask you to clarify one thing? The price paid for the entire 26 acres is $25,000; however, the appraisal for the land that you gave us, $707,850, is that based on only the 6.5 acres of land where the smelter is?

MR. LEVINSON: That's absolutely correct.

THE CHAIR: Would that explain the difference between the $1,800,000 figure that represents the entire 26 acres?

MR. LEVINSON: As I said, the piece of property I was asked to consider was that property upon which the nonconforming use existed or associated with this nonconforming use.

[MEMBER]: So it's the 6.5 acres at the southeast corner?

MR. LEVINSON: Which is roughly 283,000 square feet, if I figure that at $2.50 a square foot.

THE CHAIR: Thank you.

MR. LEVINSON: You're welcome.

Moreover, to make certain that the board accepted Levinson's analysis and included the value of the land in its determination, the city presented to the board the following testimony of Mike McClellan, a real estate appraiser. I quote McClellan's presentation before the board:

[THE CITY ATTORNEY]: The next witness I would call would be Mr. Mike McClellan of McClellan and Massey.

MR. McCLELLAN: My name is Mike McClellan my address is 2974 LBJ Expressway, Suite 415, Dallas, 75234. I'm president of McClellan, Massey, Incorporated, a real estate appraisal and consulting firm. I am a member of the American Institute of Real Estate Appraisers and hold their MAI designation. I'm also a member of the Dallas Board of Realtors. I've been asked for the City of Dallas to render an opinion of market value for the 6.5 acres as if completely vacant and uncontaminated.

Market value is briefly defined as that price in dollars which a willing buyer would pay a willing seller. Neither party under any duress. The property having been on the market for a reasonable period of time, an arm's-length transaction.

The market valve [sic] estimate I'll talk about tonight will be at the most profitable use of the property, which I consider to be some type of industrial development after it has been cleaned up and is noncontaminated. I have handed out to you a summary of four land sales that we found in the area very near the subject property.

A real estate appraiser is merely an analyst. We go out into the marketplace and we find out what people pay or sell their land for. We take these land sales, compare them to the subject property, and from that we can come up with an opinion, and it is an opinion and it is an estimate of market value for a property such as the 6.5 acres.

You will note that the four sales, I have a summary sheet on the first page, the next four pages are detailed information concerning the sales, the last page is a little map showing you the location of the sales in reference to the subject property. The most pertinent information in these sales are sale number two and number three. These are very recent sales, they're on Westmoreland, they're just to the south of the subject property in the immediate vicinity, they are very current sales, both being within the last two or three months. They're very sim-

ilarly zoned, and they sold one for $2.50 a foot, the other for $2.70 a foot.

It's my opinion, based on this market data, that a reasonable market estimate for the subject property, if vacant and uncontaminated, would be $2.75 a square foot which equates to about rounded $780,000. This differs from the memo because the memo was prepared before we found sale number three. And this market things happen pretty fast. That's the reason for the discrepancy, sale number three was found after the memo. That's my opinion of value and concludes my testimony.

THE CHAIR: Let me ask if any Board members have any questions. Mr. [---------].

[MEMBER]: Yes. Your valuation is based on the fact that there exists now a lead smelter on the property of question. Now, without a lead smelter in that neighborhood would not the property be worth more?

MR. McCLELLAN: Let me see if I understand. You're saying that if it is removed would the [2.75] be more, is that—

[MEMBER]: You're evaluating the property that we're discussing here on the basis of—I realize your entire—I appreciate the fact that you said it was vacant land, but you're going on the assumption that the value of the property is based on what land is selling for in that immediate vicinity right now, today?

MR. McCLELLAN: Yes.

[MEMBER]: I certainly appreciate that objectivity. My suggestion here to you, and I'm asking if that's correct, would not that land sell for more per square foot if there was not a lead smelter there in that vicinity? Isn't that a perhaps deterrent to higher prices of land in that immediate area?

MR. McCLELLAN: There's really—

[MEMBER]: Without a lead smelter perhaps the land would be worth more. Certainly not less?

MR. McCLELLAN: There's no way actually to prove it in the market but I would say the probability does exist, yes, sir.

[MEMBER]: About how much more do you think?

MR. McCLELLAN: I have no opinion. Without some market data, I have no opinion on it.

[MEMBER]: Thank you.

[SECOND MEMBER]: I have a question.

THE CHAIR: Yes, Mr. [----------].

[SECOND MEMBER]: It seems that I heard you say at the start that your estimate was based on if the land was vacant and if the land was cleaned up—already cleaned up. If that takes out the other bit of the lead smelter, did I hear you correctly there?

MR. McCLELLAN: Yes, sir. It was as if vacant and uncontaminated.

[SECOND MEMBER]: Then if it were cleaned, there was no lead smelter there, your estimate would be the same $2.70?

MR. McCLELLAN: That's without the lead smelter being on it. Absolutely vacant and uncontaminated.

THE CHAIR: Thank you, sir.

[THE CITY ATTORNEY]: That concludes the witnesses we intend to present at this time.

Therefore, before the board, land value was the name of the game. The board had to consider land value in order to determine an "investment" by Murmur of zero. The board needed a zero figure to avoid an amortization period, otherwise, with an amortization period, the smelter would continue to operate for the period of amortization. For political reasons, the board could not allow the smelter to continue to operate for any future period of time. Thus, the board meets on September 6, 1984, and terminates Murmur's smelting use on that same date. If the reader doubts political reasons, consider this description before the trial court of what went on at the board hearing:

The atmosphere at the hearing was much like a carnival. The press was there with television cameras and lights. Boisterous interest groups were in attendance. Applause was loud and consistent virtually every time a speaker in favor of immediate termination took the podium. At least three members of the City Council were present: Council members [----------------, ---------------- and ----------------]. All three appeared to spend much of their time at the hearing caucusing anti-Murmur speakers and groups. Twice during the proceedings I personally observed Councilman [----------------] parading through the aisles in the audience section of the hall with a white plastic respirator over his nose and mouth. Such behavior was in plain view of the Board members, who sat facing the audience, and in view of the press.

The city council appoints the members of the board.

Indeed, on the evidence before it, the board could not avoid using land value to reduce Murmur's investment in the structure. Consider application of Levinson's presentation:

| | |
|---|---|
| Closure costs | $504,000.00 |
| and demolition costs | 225,000.00 |
| | $729,000.00 |
| cannot be paid out of salvage value | 500,000.00 |
| | −$229,000.00 |
| deficit of $229,000 must then come out of land value | $707,850.00 |
| | 229,000.00 |
| | $478,850.00 |
| $25,000 purchase price of smelter must come out of balance of value of land | $478,850.00 |
| | 25,000.00 |
| | $453,850.00 |

Thus, it cannot be disputed that the board included the value of the land in making the determination required of it under the above sections of the Dallas Development Code.

Furthermore, the trial court compounded the error of including land value. In finding that the board's decision was supported by substantial evidence, the trial court adds a new component to Levinson's approach, i.e., $321,667.00 for other acquisition costs of Murmur in acquiring the plant. I quote

the trial court's approach from its memorandum opinion and order:

10. Summary. There was substantial evidence before the Board to support the following conservative analysis:

Investment in smelter:

| | | |
|---|---|---|
| Amount paid | $25,000.00 | |
| Other acquisition costs | $321,667.00 | $346,667.00 |

Less: Value of tract with smelter removed:

| | | |
|---|---|---|
| $2.75/square foot | $781,390.17 | |
| Closure | −$504,926.00 | |
| Demolition | −$225,000.00 | |
| Salvage | −$500,000.00 . | $551,464.17 |

| | |
|---|---|
| Murmur's investment in the nonconforming use = | −$204,797.17 |

Even with the adjustments the Court concludes should have been made in Levinson's analysis, there was substantial evidence before the Board that Murmur had no unrecoverable investment in the smelter. The Board's decision to terminate the smelter operation effective September 6, 1984, was therefore supported by substantial evidence.

In its calculation, the trial court increased the value of the land from $2.50 a square foot to $2.75 a square foot to adjust Levinson's presentation to the board with McClellan's corrections. Then, having thus increased the value of the land, the trial court proceeded to utilize land value to dispose of Murmur's other acquisition costs also. Therefore, the trial court also used land value to arrive at a zero figure. Needless to say, it makes no difference whether the zero figure is calculated to be a negative $452,850, per the board approach, or to be a negative $204,797.17, per the trial court's approach. Both negative amounts are less than zero and both negative amounts take into account the value of the land. Hence, each erroneous approach to zero justified to both the board and the trial court the immediate termination of nonconforming use.

All this striving to find a zero figure ignores what the board is required to do under the above provisions of the Dallas Development Code. The requirements are easy to understand. For emphasis, I repeat what I said at the beginning. The above provisions of the Dallas Development Code require the board: first, to determine the "full value" of a "structure" located upon land, which "structure" is utilized for a purpose not permitted by an applicable zoning ordinance; second, to devise a plan to accomplish the purpose of amortizing that determined "full value" within a definite period of time; and third, to designate a date upon which the use not permitted shall cease, which date shall allow the owner to recoup the "full value" of that structure. The board and the trial court failed to take even the first step and determine the "full value" of a "structure" located upon land. Indeed, the attitude of the board and the trial court is that no such first step is necessary because a "structure" cannot have "value" if the land upon which it is situated has a greater value.

I turn now to consider the effect of the board's consideration of the value of the land. A Board of Adjustment is restricted in its decisions to the powers vested in it by the legislature and city council. It may not materially alter the specific intent and extent of the zoning ordinance as this power is within the province of the city council. *Board of Adjustment of San Antonio v. Willie*, 511 S.W.2d 591, 593 (Tex.Civ.App.— San Antonio 1974, writ ref'd n.r.e.). *Accord Swain v. Board of Adjustment of University Park*, 433 S.W.2d 727, 731 (Tex. Civ.App.—Dallas 1968, writ ref'd n.r.e.), *cert. denied*, 396 U.S. 277, 90 S.Ct. 563, 24 L.Ed.2d 465 (1970). Any judgment [order] in excess of an ordinance under which a Board of Adjustment operates is void. *Board of Adjustment of San Antonio v. Nelson*, 577 S.W.2d 783, 785 (Tex.Civ.App. —San Antonio), *writ ref'd n.r.e. per curiam*, 584 S.W.2d 701 (Tex.1979).

In considering the language of a prior version of the above Dallas Development Code sections, this court held that such provisions require the discontinuance of a nonconforming use under a plan whereby full value of the structure can be amortized within a definite period of time taking into

consideration the general character of the neighborhood and the necessity for all property to conform to the regulations of the ordinance. *White v. City of Dallas,* 517 S.W.2d 344, 348 (Tex.Civ.App.—Dallas 1974, no writ). In approving the amortization period, this court in *White* further emphasized the focus on "full value of the structure" when it stated "[t]he buildings, and other property located on the land in question was of such a nature as could obviously be removed during the twelve-month period." *White,* 517 S.W.2d at 349.

The technique of amortization of "the full value of the structure" is a valid exercise of the police power. *See City of University Park v. Benners,* 485 S.W.2d 773, 777 (Tex.1972), *appeal dismissed,* 411 U.S. 901, 93 S.Ct. 1530, 36 L.Ed.2d 191 (1973). The usual approach to the "amortization" technique rests on the principle that there is not a legally significant difference between existing and prospective uses in land and that the required termination of a pre-existing land use, with allowance for recoupment, is no different in kind from restrictions upon future land use alternatives. *Benners,* 485 S.W.2d at 777. Thus, termination does not constitute a "taking" in the eminent domain sense, but an exercise of the police power in the public interest. *Benners,* 485 S.W.2d at 777–78.

*Benners,* therefore, brings us to the heart of what is so wrong about the board's order. *Benners* allows the technique of amortization of "full value of the structure" as a valid exercise of the police power because under that technique nothing is "taken" from an owner by government. No "taking" occurs because amortization over a designated period of time theoretically permits the owner to recover the dollars he has invested in the structure, and the owner still retains the full value of his land. Hence, the owner loses nothing of value in the eminent domain sense by inverse condemnation, i.e., uncompensated taking of property. The technique of amortization of "the full value of the structure," however, loses its nature as an exercise of police power when the owner's investment in the land is used, in whole or in part, to erase "the full value of the structure" from consideration, as was done in the present case. In that instance, the owner's own dollars in land are used to pay for the owner's own dollars in the structure situated upon the land. That situation occurs in the present case. In my view, use of the owner's dollars in land to "pay off" the owner's dollars in the structure constitutes a "taking" in the eminent domain sense. "While property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. . . . We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Mahon,* 260 U.S. at 415–16, 43 S.Ct. at 160. Therefore, to my mind, the board's approach and the trial court's approach destroy the basis upon which the technique of amortization of the full value of the structure has been permitted as a valid exercise of the police power.

In the present case, the board included the value of the land in making the determination required of it under the above sections of the Dallas Development Code. In light of *Benners* and *White,* I would hold that the "amortization" approach in the Dallas Development Code presumes existing and future values of unimproved land to be the same. Hence, in my view, amortization of "the full value of the structure" alone is reasonable and bears a fair relationship to the object sought to be obtained. *See Benners,* 485 S.W.2d at 777–78. It follows, and I would so hold, that the board was not authorized to consider land value in making the determination required of it under the above sections of the Dallas Development Code.

Since the board included the value of the land in terminating the nonconforming use, the board failed to follow the applicable provisions of the Dallas Development Code adopted by the City of Dallas to govern the board's authority and duties. Therefore, the board entered an order in excess of an ordinance under which it operates. Conse-

quently, its order is void. *Nelson*, 577 S.W.2d at 785. Therefore, I would reverse the judgment of the trial court, vacate the permanent injunction and render judgment declaring that the September 6, 1984 order of the Board of Adjustment of the City of Dallas is void.

I would not, however, preclude new proceedings before the board to terminate Murmur's nonconforming use. In light of the disposition I would make of the present case, it is unnecessary to address Murmur's remaining points of error. More particularly, this court need not address Murmur's claims for damages and attorney's fees in light of the remand to the trial court.

Although I need not address Murmur's remaining points of error, I am compelled to touch upon an error I note in the trial court's treatment of "substantial evidence." In *Swain*, 433 S.W.2d at 730, this court perceived the standard of review applicable to orders of a board of adjustment as follows:

> Briefly, these governing legal principles may be summarized: (1) The only question which may be properly raised in a review of the decision of the Board of Adjustment by writ of certiorari is that of the legality of the board's order; (2) a legal presumption exists in favor of the board's order and the burden of proof to establish its illegality rests upon those who attempt to overcome its presumption of validity; (3) the principal issue on appeal from such order of the board is whether or not there is any substantial evidence affording reasonable support for the findings and order entered, such being a question of law, and not one of fact. If the evidence before the court, as a whole, is such that reasonable minds could have reached the conclusion that the board must have reached in order to justify its action, then the order must be sustained.

I cannot agree, however, that a judicial finding of substantial evidence affording reasonable support for the findings and order entered by a board of adjustment

makes legal a board of adjustment order which is void. For example, a board of adjustment order dissolving a court would be void and no amount of substantial evidence that the court should be dissolved can make such a board of adjustment order valid. Therefore, substantial evidence supporting a void board of adjustment order cannot overcome the illegality of a board of adjustment order. Thus, a substantial evidence "bootstrap" technique cannot justify a board of adjustment's failure to comply with an ordinance adopted by a city council to govern the board of adjustment's authority and duties.

HOWELL, J., joins in this concurring opinion.

McCRAW, Justice, concurring.

I concur with the opinion of the majority reversing the judgment of the trial court, vacating the permanent injuction, and finding the Board of Adjustment order void. I write to express my disagreement with the majority's commingling of the proper, abuse of discretion test with the substantial evidence test, in certiorari review of board of adjustment orders.

In my view, the majority properly stated that the correct standard of review of a Board of Adjustment proceeding as per *Nu-Way Emulsions, Inc. v. City of Dalworthington Gardens*, 617 S.W.2d 188 (Tex.1981), is abuse of discretion. Then the majority overlooks the Texas Supreme Court's express rejection of the use of the substantial evidence test for reviewing a zoning board's decisions, *Nu-way*, 617 S.W.2d at 189 (citing *City of San Angelo v. Boehme Bakery*, 144 Tex. 281, 190 S.W.2d 67, 71 (1945)), and attempts to wrongfully measure abuse of discretion by substantial evidence standards. In a certiorari proceeding determining whether a city's Board of Adjustment has abused its discretion, the reviewing court is to consider the verified return along with *all* the evidence introduced, and *from a consideration of the whole*, determine whether or not the board abused its discretion. Whether the board abused its discretion is a question of law. The court makes its determination by

viewing the whole record and upholds the Board's actions if it *could not be held* that it had abused its discretion. *City of San Angelo,* 190 S.W.2d at 70.

In its past decisions, this court has incorrectly applied the substantial evidence test as the standard of review for determining the legality of a Board of Adjustment's order. The substantial evidence test as set out in *White v. City of Dallas,* 517 S.W.2d 344, 348 (Tex.Civ.App.—Dallas 1974, no writ) states that if the evidence before the court, taken as a whole, is such that reasonable minds *could have* reached the same conclusion reached by the Board, then the order must be sustained. The substantial evidence test is used in *White,* 517 S.W.2d at 348; *Swain v. Board of Adjustment,* 433 S.W.2d 727, 730 (Tex.Civ. App.—Dallas 1968, writ ref'd n.r.e.); and *City of Dallas v. Fifley,* 359 S.W.2d 177, 181 (Tex.Civ.App.—Dallas 1962, writ ref'd n.r.e.) in reliance upon *Jacobson v. Preston Forest Shopping Center, Inc.,* 359 S.W.2d 156, 159–60 (Tex.Civ.App.—Dallas 1962, writ ref'd n.r.e.). *Jacobson* is a writ of certiorari which complains of a decision by the Dallas Board of Adjustment. The test pronounced in that opinion is based upon *Thomas v. Stanolind Oil & Gas Co.,* 145 Tex. 270, 198 S.W.2d 420, 421 (1946) (a Railroad Commission case); *Trapp v. Shell Oil Co.,* 145 Tex. 323, 198 S.W.2d 424, 440–41 (1946) (a Railroad Commission case); *Huguley v. Board of Adjustment,* 341 S.W.2d 212, 218 (Tex.Civ.App.—Dallas 1960, no writ) (a Board of Adjustment case that cites the above cases); and *Board of Adjustment v. Underwood,* 332 S.W.2d 583 (Tex.Civ.App.—San Antonio 1960, writ ref'd n.r.e.) (which merely mentions the substantial evidence test); *City of Dallas v. Stevens,* 310 S.W.2d 750, 755 (Tex.Civ. App.—Dallas 1958, writ ref'd n.r.e.) (involving an "administrative agency"—not the Board of Adjustment). These cases are all dependent upon *Trapp,* a case involving a Railroad Commission decision. In *City of San Angelo* the Texas Supreme Court expressly states that it does not approve of the court of appeals decision which likened the certiorari procedure in a review of a Board of Adjustment decision to an appeal from an order of the Railroad Commission. The Supreme Court stated that the two proceedings are not strictly analogous. The certiorari proceeding is governed by the zoning statute, and from that statute's provisions, the courts are to determine the scope of judicial review. *City of San Angelo,* 190 S.W.2d at 69; *see* TEX.REV.CIV. STAT.ANN. art. 1011a (Pamph.1986). The Railroad Commission's powers are designated in section 81.053 of the Texas Revised Civil Statutes. Although the Board of Adjustment and the Railroad Commission are both quasi-judicial bodies with fact finding responsibilities, the Railroad Commission has the additional power to make rules and orders. *Gulf Land Co. v. Atlantic Refining Co.,* 134 Tex. 59, 131 S.W.2d 73, 81 (1930); TEX.NAT.RES.CODE ANN. sec. 85.202 (Vernon 1978). It may enforce these orders and rules by requiring attendance of witnesses and through its contempt power. TEX.NAT.RES.CODE ANN. sec. 81.053 (Vernon 1978). The Board of Adjustment's powers are limited to those enumerated by the city's zoning regulations. *Swain,* 433 S.W.2d 731. The Dallas Board of Adjustment is merely a fact finding body. Dallas Development Code section 513.102. These differences in conferred powers could explain the Texas Supreme Court's reasoning in requiring differing standards of review for the Board orders as opposed to those of the Railroad Commission rulings.

The test for an abuse of discretion is whether the evaluator's decision was arbitrary or unreasonable. *Landry v. Traveler's Insurance Co.,* 458 S.W.2d 649, 651 (Tex.1970); *Bennett v. Northcutt,* 544 S.W.2d 703, 707 (Tex.Civ.App.—Dallas 1976, no writ). The Board's duties at the September 1984 hearing were two-fold: (1) to devise a plan whereby the full value of the structure can be amortized within a definite time period, Dallas Development Code section 51–3.102(c)(4); and (2) to provide a termination date for the nonforming use, having due regard for the investment in the said use, Dallas Development Code

Section 51–4.704(a)(1). We must review the Board's actions, and "from a consideration of the whole" determine if the board complied with its duties, or abused its discretion. At the hearing, no plan for amortization of the full value of the structure within a definite time period was devised. I find this to be a "very clear" abuse of discretion. The Board was charged under the code to set a termination date, having due regard for investment. An instanter date was set. I find this action to be clearly arbitrary and unreasonable. I find the Board's action exceeded its powers, thereby committing an abusive act. For the above reasons and from a consideration of the whole, I would hold the Board of Adjustment order void.

## ON MOTION FOR REHEARING

DEVANY, Justice, dissenting.

This appeal was originally assigned to Justice Devany by the panel before which this case was submitted. At the request of a majority of the justices, Chief Justice Guittard called an en banc conference. After considerable deliberations, the court sitting en banc concluded that the Board of Adjustment of the City of Dallas improperly terminated the nonconforming use of the lead smelter without establishing Murmur's investment in the improvements. I am convinced that my colleagues are incorrect in the conclusion they have reached and I now write to state my reason. I would grant the motion for rehearing and affirm the judgment of the court below. Because the majority opinion has recited the facts sufficiently, I shall merely point to the precise reason I dissent.

Murmur is a late-comer to the facts of this case. The former owners liquidated their investments in prior years, realizing a gain or loss in both their operations and their sales of the property. Murmur paid $25,000 for the entire property, including land and improvements thereon. While it may be true that Murmur incurred acquisition costs to legally acquire the property, it incurred no costs in erecting improvements before it was informed that the City would terminate the nonconforming use. Its exposure of responsibility for clean-up costs of the land would be what any *land* purchaser would be exposed to, and such costs would be part of acquiring the land, not the improvements.

To satisfy itself that Murmur had no investment in the improvements, the Board of Adjustment established that the underlying land was worth many times the purchase price of $25,000, the value being in the millions of dollars. Indeed, the majority is correct when it holds that the Board may not offset any investment that Murmur has in the improvements *against* the value of the land. The majority errs, however, in assuming there *is* a cost in the investment in any improvements on the land.

To illustrate the point, assume that the owner of certain land and building finds that his use of the premises is no longer feasible because the building is no longer useful resulting from a dangerous condition existing. He then sells the whole property with the understanding that he is selling the land and giving the building to the new owner rather than be responsible for its dangerous condition. I believe that generally accepted principles of accounting would require that no part of the purchase price be assigned to the structure. Indeed, I do not believe that any portion of the purchase price would be depreciable for tax purposes. This principle is further emphasized when the purchase price is $25,000 and the value of the land alone is worth millions of dollars. In other words, the purchaser would have no investment in the building under this assumed set of facts.

In the instant case, there was more than sufficient evidence before the Board of Adjustment to reach the conclusion that Murmur had no investment in the improvements on the land it purchased. Additionally, the evidence was overwhelming that the operation of the lead smelter by the new owner was an impracticality and that no profit could be realized out of which it could recover anything. It is well understood that any business investment has as

its primary purpose the making of a profit. There was absolutely no evidence that Murmur could operate the smelter in that neighborhood profitably. It would have been an exercise in futility for the Board of Adjustment to conjure up a part of the $25,000 as attributable to the structure, and it would have been a further exercise in futility to have assigned a period of time in which to recover such an imaginary cost out of *no profits.*

Board decisions should be affirmed if they may be upheld under any legal theory, regardless of the reason assigned by the Board. *City of Dallas v. Fifley,* 359 S.W.2d 177, 182 (Tex.Civ.App.—Dallas 1962, writ ref'd n.r.e.).

VANCE, HOWELL, SCALES and HOLLINGSWORTH, JJ., join in this opinion.